# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| TERRANCE MLECZKO and TM DEFENSE SOLUTIONS LLC, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>    v.<br><br>DAVID DAVIS ~~and~~, FREDERICK S. CROMER, and EDWARD M. CHRISTIE III,<br><br>      Defendants. | **Case No. 0:25-cv-61959-WPD**<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS...........................................................................................................i

TABLE OF DEFINITIONS....................................................................................................iii

NATURE OF THE ACTION....................................................................................................1

JURISDICTION AND VENUE................................................................................................9

PARTIES................................................................................................................................10

RELEVANT NON-PARTY....................................................................................................11

SUBSTANTIVE ALLEGATIONS........................................................................................11

    I.    Background....................................................................................................................11

    II.    Materially False and Misleading Statements Issued During the Class Period................21

    III.    The Truth Begins to Emerge............................................................................................29

    IV.    Additional Allegations of Scienter..................................................................................34

        A.  Defendants had Actual Knowledge of the Information They Concealed From

            Investors................................................................................................................34

        B.  That the Misrepresentations Concerned the Core Operations of the Company

            Bolsters an Inference of Scienter.........................................................................38

        C.  That Defendants Were Preparing for their Second Bankruptcy by June 2025 but did

            not Tell Investors Supports Scienter.....................................................................39

        D.  Defendants' Hiding Terms of Spirit's Aircraft Sale Agreement Suggests

            Scienter.................................................................................................................39

PLAINTIFFS' CLASS ACTION ALLEGATIONS................................................................40

COUNT I (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants) ........................................................................................42

COUNT II (Violations of Section 20(a) of the Exchange Act Against Defendants).....................45

PRAYER FOR RELIEF ................................................................................................................47

DEMAND FOR TRIAL BY JURY ..............................................................................................47

**TABLE OF DEFINITIONS**

| Term or Acronym | Definition |
|---|---|
| Aircraft Sale Agreement | The $519 million aircraft sale agreement between Spirit and GAT |
| ASC | Accounting Standards Codification rules of FASB |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Christie III or Christie | Edward M. Christie |
| Class | All those who purchased or otherwise acquired Spirit Aviation Holdings, Inc. stock (ticker: "FLYY") on the open market during the Class Period.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest |
| Class Period | March 12, 2025 through August 29, 2025, both dates inclusive |
| Company or Spirit | Spirit Aviation Holdings, Inc. |
| Confirmation Plan | Spirit's plan to emerge from the First Bankruptcy, which was approved through the Bankruptcy Court |
| Cromer | Frederick S. Cromer |
| Davis | David Davis |
| Defendants | David Davis, Frederick S. Cromer, and Edward M. Christie III |
| Exchange Act | Securities Exchange Act of 1934 |
| Elavon | U.S. Bank Subsidiary that provides credit card processing services to Spirit |
| Examiner | Marc J. Heimowitz |
| Examiner Report | The December 15, 2025 Examiner Report filed in the Second Bankruptcy |
| Exit Revolving Credit Facility | Amended and Restated Credit and Guaranty Agreement with lenders of the revolving credit facility |
| EVP | Executive Vice President |

iii

| Term or Acronym | Definition |
|---|---|
| FAA | Federal Aviation Administration |
| FASB | Financial Accounting Standards Board |
| First Bankruptcy | *In re Spirit Airlines, LLC et al.*, Case No. 24-11988-SHL (Bankr. S.D.N.Y. 2024) |
| FLYY | Spirit's ticker symbol for trading on NYSE American |
| FLYYQ | Spirit's ticker symbol for trading in the over-the-counter market |
| Form 10-Q | A quarterly report filed by a public company with the SEC |
| FY | Fiscal Year |
| FY 2024 Form 10-K | The 2024 fiscal year annual report |
| GAT | GA Telesis LLC |
| Huebner Declaration | Sworn Second Bankruptcy declaration of Davis Polk Partner Marshall S. Huebner |
| IAE | International Aero Engines, LLC, which is the engine maintenance affiliate of Pratt & Whitney |
| NYSE | New York Stock Exchange |
| OTC | Over-the-counter market exchange |
| Plaintiffs | Terrance Mleczko and TM Defense Solutions LLC |
| Plan of Reorganization | First Bankruptcy's Chapter 11 plan of reorganization that was confirmed on February 20, 2025 and became effective March 12, 2025 |
| SEC | United States Securities and Exchange Commission |
| Second Bankruptcy | *In re: Spirit Aviation Holdings, Inc., et al.*, Case No. 25-11897-SHL (Bankr. S.D.N.Y. 2025) |
| Spirit | Spirit Aviation Holdings, Inc. |
| Spirit Airlines | Spirit Airlines, LLC |
| ULCC | Ultra-low-cost carrier airline |

iv

Co-Lead Plaintiffs Terrance Mleczko and TM Defense Solutions LLC ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, David Davis ("Davis"), Frederick S. Cromer ("Cromer), and Edward M. Christie, III ("Christie," collectively "Defendants"), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Spirit Aviation Holdings, Inc. ("Spirit" or the "Company"), filings made by Spirit and its predecessor entity and knowledgeable individuals in Spirit's bankruptcy proceedings, interviews with knowledgeable former employees, analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Spirit securitiesAviation Holdings, Inc. (ticker: "FLYY") on the open market between May 28March 12, 2025, and August 29, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5

1

promulgated thereunder, against ~~the Company and certain of its~~Defendants, who each served as the Company's top officials.

2. In late April 2025, Spirit announced that its common stock had been approved for listing on the New York Stock Exchange American ("NYSE"), with public trading to begin on April 29, 2025, under the ticker symbol FLYY.

~~2.~~3. Spirit is the parent company of Spirit Airlines, LLC ("Spirit Airlines"), an ultra-low-cost ~~American~~carrier airline ("ULCC") that provides passenger air transportation services for destinations throughout the U.S., Latin America, and the Caribbean. At all relevant times, Spirit and its predecessor entity operated as a ULCC focusing on leisure passenger travel. The Defendants in this action are the Company's current and former officers Davis, Cromer and Christie. Davis has served as Spirit's President and Chief Executive Officer since April 17, 2025; Cromer has served as Spirit's Executive Vice President and Chief Financial Officer at all relevant times; and Christie served as Chief Executive Officer from 2019 until April 7, 2025. Prior to that, Christie served as the Company's Chief Financial Officer from 2012 to 2019. Defendants made the statements alleged as false and misleading herein.

~~3.~~4. In the last two years, Spirit and its predecessor have declared bankruptcy twice, first in November 2024, and again in August 2025. In November 2024, Spirit's predecessor entity, Spirit Airlines, Inc~~. ("Former Spirit") and its subsidiaries (collectively with Former Spirit, the "Corporate Debtors").~~, and its affiliated debtors filed a voluntary petition for Chapter 11 bankruptcy protection after years of mounting losses and increased competition, among other issues~~.~~ ("First Bankruptcy").[1] The August 2025 bankruptcy, *In re: Spirit Aviation Holdings, Inc.*,

---

[1] *See In re Spirit Airlines, LLC, et al.*, Case No. 24-11988-shl (Bankr. S.D.N.Y. 2024). Citations to this docket herein are referred to as "First Bk. DE [  ]."

*et al.*, 25-11897-shl (Bankr. S.D.N.Y. 2025) ("Second Bankruptcy"), was filed just five months after Spirit emerged from the First Bankruptcy.[2]

4.5.   In March 2025, Spirit emerged from Chapter 11 bankruptcy protection after the Corporate DebtorsFirst Bankruptcy Court determined that Spirit satisfied the conditions precedent to consummation of a pre-arranged Chapter 11 plan of reorganization. *See* [First Bk. DE 500] (the "Plan of Reorganization"), whereby, *inter alia*, the Corporate Debtors emerged from Chapter 11 bankruptcy protection.  In connection with the"). The Plan of Reorganization, Former was confirmed on February 20, 2025, and became effective on March 12, 2025.  [First Bk. DE 533]. Pursuant to the Plan of Reorganization, Spirit completed a corporate reorganization pursuant to which Spirit Aviation Holdings, Inc. became the new parent company of the Corporate Debtors, with Former Spirit becoming a wholly-owned subsidiary of Spirit Airlines, and the latter was converted from a Delaware corporation to a Delaware limited liability company.

5.   In late April 2025, Spirit announced that its common stock had been approved for listing on the NYSE American ("NYSE"), with public trading to begin on April 29, 2025 under the ticker symbol "FLYY."

6.   Thereafter, at all relevant timesIn the Disclosure Statement in the First Bankruptcy, which was signed by Cromer, Spirit projected that liquidity would grow to $1.6 billion by fiscal year 2028.  [First Bk. DE 270 at 88 of 390 (December 18, 2024)]. In that same Disclosure Statement, Spirit projected improvements both to liquidity and profitability, projecting a $252 million profit in 2025.  [First. Bk. DE 270 at 84 of 390].[3] As Spirit emerged from its First

---

[2] Citations to the Second Bankruptcy docket are referred to as "Second Bk. DE [   ]."
[3] *See also* https://onemileatatime.com/news/spirit-airlines-projected-profit/

Bankruptcy, it continued to tout a rosy turnaround story and downplayed an internally-known looming liquidity catastrophe.

7.      Spirit reported in its First Bankruptcy Disclosure Statement that it would have approximately $913 million in liquidity at the end of Fiscal Year 2024, which would consist of the sum of unrestricted cash, cash equivalents and short-term investments on the Company's balance sheet, as well as a $275 million credit facility. [First Bk. DE 270 at 88, 244 of 390 (December 18, 2024)]. Spirit did not include restricted cash in its liquidity calculations. [First Bk. DE 270 at 85, 87 of 390 (December 18, 2024)]. As it emerged from bankruptcy, Spirit entered into an Amended and Restated Credit and Guaranty Agreement with the lenders of the revolving credit facility due in 2026 ("Exit Revolving Credit Facility") that provided $275.0 million and an uncommitted incremental revolving credit facility up to $25.0 million. *See* Spirit's Fiscal Year Form 10-K ("FY 2024 Form 10-K") at 7.

8.      Throughout the Class Period, maintaining adequate liquidity was essential to Spirit's survival. Spirit had an $850 million liquidity requirement under its credit card processing agreement with Elavon, which if not maintained, would trigger crippling holdbacks and reduce unrestricted cash by hundreds of millions of dollars. Spirit did not disclose the terms of this agreement during the Class Period although it materially threatened Spirit's solvency. Instead, the liquidity covenant was reported in the Examiner Report in the Second Bankruptcy. [Second Bk. DE 595 at 35].[4] Thus, just after emerging from its First Bankruptcy, Spirit was already on the

---

[4] On October 29, 2025, the Bankruptcy Court appointed Marc J. Heimowitz as Examiner. ("Examiner") [Second Bk. DE 381]. The Examiner's mandate was to investigate, and report on, the circumstances that led Spirit to refile for bankruptcy within five months of emerging from its first bankruptcy. ("Examiner Report"). [Second Bk. DE 595 at 6]. This mandate, among other things, included investigating the "pre-filing and pendency periods" of Spirit's first bankruptcy to determine whether Spirit's Second Bankruptcy was foreseeable or contemplated during the First

4

doorstep of triggering a devastating liquidity covenant, a risk known to Defendants.  In addition, its $275 million Exit Revolving Credit Facility contained a $500 million liquidity requirement, and its $840 million in secured notes had a $450 million liquidity requirement.[5]

9.    Even at the beginning of the Class Period, Defendants knew they had little chance of avoiding these covenants.  Spirit's operating income was approximately negative $100 million per month, virtually ensuring default and acceleration of its debt obligations.  Defendants did not disclose these known, imminent triggers until just days before the end of the Class Period.

10.    Defendants claimed to count on liquidity from an announced sale of 23 A320/A321 Airbus jets to GA Telesis ("GAT") for $519 million ("Aircraft Sale Agreement").  However, they knew that they had not verified those planes to be in a saleable state of maintenance and that the engines required repair. The Aircraft Sale Agreement with GAT dated October 29, 2024 conditioned all sales subject to passing inspection and technical acceptance, but the public filing of the Aircraft Sale Agreement as an Exhibit to Spirit's FY 2024 Form 10-K redacted key parts of these provisions in order to conceal from investors the huge risk that the 23 planes were not in a condition to pass inspection or gain technical acceptance.  *See* FY 2024 Form 10-K Ex. 10.71 at Exhibit D (Inspection and Technical Acceptance).  However, as later revealed in the Second Bankruptcy through the Examiner Report, the terms required that aircraft engines undergo borescope inspections, which identify defects in internal components that are not otherwise observable. [Second Bk. DE 595 at 39].

---

Bankruptcy.  [Second Bk. DE 595 at 7-8]. Citations to pages from the Examiner Report refer to the page number of the report itself, rather than the ECF-generated pagination.
[5]  *See*  https://www.fitchratings.com/research/corporate-finance/fitch-downgrades-spirit-airlines-to-ccc-affirms-eetc-ratings-15-08-2025; https://www.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3340434

11.     This acute risk of failing inspection was known to Defendants because the engine models from the aircraft to be sold in the Aircraft Sale Agreement had known un-contained failures and were subject to multiple FDA Airworthiness Directives. In fact, numerous aircraft failed these inspections. Defendants also knew throughout the Class Period that they were unable to timely book repair slots to bring the aircraft to saleable condition. *Id.* In particular, Spirit had been unable to book needed engine repair slots during the Class Period because of extended queues at Pratt & Whitney's engine maintenance affiliate, International Aero Engines, LLC ("IAE"), which had been known since 2023. *Id.* By the end of the Class Period, only three of the planned 23 aircraft had been delivered. This was disastrous for the Company, which was already experiencing operating losses of approximately $100 million per month and negative cash flow of approximately $80 million per month. According to the Examiner Report in the Second Bankruptcy, "by the confirmation hearing" in the First Bankruptcy, ***prior to the Class Period***, the "Debtors had sufficient information to determine that the Projections' assumption of 21 aircraft sold by Q3 2025 was unlikely to be met." *Id.* at 40.  Defendants chose to conceal that information from investors.

12.     Defendants also manipulated the version of the Aircraft Sale Agreement in the FY 2024 Form 10-K to redact the contractual delivery schedule, because revealing it would disclose that the aircraft had not been delivered on schedule.  The sale was to proceed according to a set schedule in the Aircraft Sale Agreement.  Although Spirit disclosed the body of the Aircraft Sale Agreement, it did not disclose the Inspection and Technical Acceptance Concerns or the delivery schedule.  However, as the Examiner Report explained, this sale to GAT failed in "early 2025" when "[n]umerous aircraft failed these inspections." [Second Bk. DE 595 at 39].

~~6.~~13.    During the Class Period, Defendants touted ~~their purported plan~~to investors that they were then positioned to enhance Spirit's liquidity, financial condition, and business

operations, as well as the purportedand were then achieving positive impacts from these measures were having the Company's business and financial results.. In so doing, Defendants indicated toassured investors and the market that Spirit's business had successfully emerged from bankruptcy protection on an improved financial footing with the requisite corporate strategy and meanswas then positioned to operate as a publicly traded companygoing concern.

7.14. Throughout the Class Period, Defendants made materially false and misleading statements regarding Spirit's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/orthat failed to disclose that, even at the beginning of the Class Period: (i) Spirit was at substantial riskon the brink of being unable to meet certainbreaching liquidity covenants, risking a default and acceleration of its debt and other financial obligations; (ii) Spirit was also at substantial risk of being forced to file for Chapter 11 bankruptcy protection within a mere matter of monthsnot positioned to operate as a going concern and did not have sufficient liquidity to sustain the Company's operations; (iii) accordingly, Defendants had overstated enhancements to Spirit's financial condition, liquidity, and overall business and operations, while simultaneously downplaying the negative impacts of adverse market conditions on the same; and Spirit had failed to meet delivery terms for a key $519 million aircraft sale necessary for its liquidity needs; (iv) the planes subject to that agreement were not maintained to a saleable condition, and Defendants had no reasonable basis to believe they would pass inspection and technical acceptance; and (v) as a result, Defendants' public statements regarding liquidity and the Aircraft Sale Agreement were materially false and misleading at all relevant times.

15. OnDespite being on the brink of triggering liquidity covenants and still losing approximately $100 million per month, Defendants told investors, in Spirit's May 30, 2025, Form 10-Q that they expected to have sufficient liquidity for the next 12 months and that they had

"***implemented and continue to implement plans to improve our liquidit***y." ("Q1 2025 Form 10-Q").  Defendants did not disclose that the Company was already in a severe liquidity crisis and was then rapidly burning through cash at a rate that would trigger liquidity covenants within weeks.

8.16.   The concealed risks were partially disclosed on August 11, 2025, when Spirit filed a quarterly report on Form 10-Q with the SEC for the period ended June 30, 2025. ("Q2 2025 Form 10-Q").  Therein, Defendants disclosed that "admitted that, contrary to their recent statement, there is was "substantial doubt as to the Company's ability to continue as a going concern within 12 months[,]" citing, *inter alia*, "adverse market conditions" and "minimum liquidity covenants in the Company's debt obligations and credit card processing agreement [that] require financial results to improve at a rate faster than what the Company is currently anticipating."

9.17.   On this news, Spirit's stock price fell $1.44 per share, or 40.68%, to close at $2.10 per share on August 12, 2025.

18.     ***That same month***However, Defendants muted further declines by concealing the full extent of Spirit's liquidity problem by omitting that Spirit had *already* breached its liquidity covenant with Elavon, its credit card processor, and that its key Aircraft Sale Agreement had *already* been terminated, depriving it of a key source of potential liquidity.  Within days, and at least by August 21, 2025, Spirit had drawn down 100% of its Exit Revolving Credit Facility.  Also on August 21, 2025, Spirit stated that it had made a $50 million payout to Elavon and agreed to further provide Elavon a $3 million per day holdback, in exchange for waiving Spirit's breach of the $850 million minimum liquidity requirement, which Defendants had known about all along but concealed from investors.

19.     The next day, on August 22, 2025, *The Wall Street Journal* reported that Spirit was exploring strategic alternatives and had retained financial adviser PJT Partners to explore a second

8

bankruptcy.  The article noted that the "carrier is on shaky financial ground after its recent reorganization fell short of providing a long-term fix."  On this news, the stock price dropped over 14% the next trading day, closing at $1.41 per share on August 25, 2025.

10.20.  A week later, on August 29, 2025, Spirit issued a press release wherein Defendants disclosed, *inter alia,*stating that "the Company has filed voluntary petitions for Chapter 11 in the U.S. Bankruptcy Court for the Southern District of New York" and that "[t]he [Company's] shares are expected to be cancelled and have no value as part of Spirit's restructuring."  This was both a materialization of the concealed liquidity risks and a disclosure that the Company's liquidity (including the prospect of a $519 million infusion from the Aircraft Sale Agreement) had been misrepresented throughout the Class Period.

11.21.  OnSpirit's stock did not trade on the next trading day, September 2, 2025, because the NYSE suspended trading of Spirit's common stock..  As Spirit explained in an SEC filing on Form 8-K dated September 3, 2025, the Company had received a notice from the regulatory staff of the NYSE (the "NYSE Regulation") on September 2, 2025, wherein the NYSE Regulation notified Spirit that it "had determined to commence proceedings to delist the common stock . . . of the Company"," and, accordingly, trading in Spirit's common stock "was suspended immediately on September 2, 2025."

12.22.  Following the foregoing disclosures and developmentsOn this news, Spirit's stock price fell $0.71 per share, or 58.220%, to close at $0.51 per share when trading resumed on September 3, 2025—the first day that the Company's common stock began trading on the over-the-counter ("OTC") market under the ticker symbol, "FLYYQ."

9

13.23.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.24.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.25.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

16.26.  Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Spirit is headquartered in this District.  Defendants conduct business in this District, at the Company's Dania Beach headquarters.  Plaintiffs are informed and believe that Defendants operated at Spirit's headquarters in this District and a significant portion of Defendants' actions took place within this District.  Plaintiffs are also informed and believe that Defendants each reside in this District.  Plaintiffs base this belief on Davis and Cromer's public LinkedIn pages referring to their locations as the Miami-Fort Lauderdale area and news articles referring to Christie residing in Fort Lauderdale.

17.27.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

18.28.  Plaintiffs, as set forth in the ~~attached~~previously filed Certifications, [DE 1, 13-3, 13-5], acquired Spirit securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

~~19.      Defendant David Davis ("Davis") has served as Spirit's President and Chief Executive Officer at all relevant times.~~

~~20.      Defendant Frederick S. Cromer ("Cromer") has served as Spirit's Executive Vice President and Chief Financial Officer at all relevant times.~~

29.      Defendant Davis has served as Spirit's President and Chief Executive Officer since April 17, 2025.  Davis certified that the Q1 2025 Form 10-Q and Q2 2025 Form 10-Q each "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

30.      Defendant Cromer has served as Spirit's Executive Vice President and Chief Financial Officer at all relevant times.  Cromer signed the Q1 2025 Form 10-Q and Q2 2025 Form 10-Q and certified that the Q1 2025 Form 10-Q and Q2 2025 Form 10-Q each "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the

11

financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

31.     Defendant Christie served as Chief Executive Officer from 2019 until April 7, 2025.  Prior to that, Christie served as the Company's Chief Financial Officer from 2012 to 2019.

21.32.  Defendants Davis and, Cromer, and Christie are collectively referred to herein as the "Defendants."

22.33.  Defendants possessed the power and authority to control the contents of Spirit's SEC filings, press releases, and other market communications.  Defendants were provided with copies of Spirit's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Spirit, and their access to material information available to them but not to the public, Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  Defendants are liable for the false statements and omissions pleaded herein.

## RELEVANT NON-PARTY

23.34.  Spirit is a Delaware corporation with principal executive offices located at 1731 Radiant Drive, Dania Beach, Florida 33004.  Throughout the Class Period, Beginning on April 29, 2025, the Company's common stock traded in an efficient market on the NYSE American under the ticker symbol "FLYY," after which it."  After the Class Period, Spirit began trading on the OTC market under the ticker symbol "FLYYQ."

12

## SUBSTANTIVE ALLEGATIONS

### I.      Background

24.35.  Spirit is the parent company of Spirit Airlines,.  Spirit assumed its current identity as a low-cost airline in 1992, having previously operated as a cargo shipper in the 1980s.  In 1992, Spirit Airlines, Inc. began operating commercial flights as the newly formed Spirit Airlines.  Early routes included Detroit-Atlantic City, with several Floridian destinations added the following year. Despite an overbooking scandal in 1994, Spirit Airlines continued to grow throughout the 1990s. Today, Spirit operates as an ultra-low-cost American airline that provides passenger air transportation services for destinations throughout the U.S., Latin America, and the Caribbean.

25.      On November 18, 2024, as a result of, *inter alia*, years of mounting losses and increased competition, Former Spirit, and subsequently on November 25, 2024, its subsidiaries, filed a voluntary petition for relief under Chapter 11 of Title 11 of the U.S. Code in the U.S. Bankruptcy Court of the Southern District of New York.

36.      On March 12, 2025, the Corporate DebtorsIn recent years, Spirit has been faced with mounting losses and diminishing cash reserves due in part to increased competition from other U.S carriers as legacy carriers increased capacity and discounted fares on leisure routes.  *See* [Second Bk. DE 595 at 15].  In Fiscal Year 2022, Spirit posted net losses of $554.2 million.  Results only improved slightly in 2023 when Spirit lost $447.5 million.  As the Examiner noted, Spirit's revenue growth was well-below expectations given the industry's strong demand recovery post-COVID.  By 2024, the situation became untenable as losses ballooned to $1.23 billion or over $100 million per month that year.  *See* FY 2024 Form 10-K.  Revenue declined from $5.36 billion in 2023 to $4.91 billion in 2024.

37.      At the same time revenues were declining, Defendants ramped Spirit's spending. Total operating expenses increased from $5.858 billion in 2023 to $6.019 billion in 2024 even

13

though there were fewer aircraft in service. These increases were material, and more than offset decreasing fuel prices.

38. Spirit's cash burn continued to worsen in 2024 and 2025. Spirit burned $758.1 million in cash from its operations during Fiscal Year 2024 compared to $246.7 million in 2023. FY 2024 Form 10-K. In the First Quarter of 2025, the Company reported negative cash flow of $234.3 million, which worsened to $239.1 million in the Second Quarter of 2025.[6]

39. As a result of these factors and known problems with its aircraft fleet, Spirit lagged behind other ULCC competitors. Below is a chart from the Examiner Report showing Spirit's operating results since the Fourth Quarter of 2023. [Second Bk. DE 595 at 15.] A company's operating profit accounts for net income from core business functions for a given period. Operating profit excludes interest and taxes, as well as any profits or losses from ancillary investments, such as other businesses in which a company has an interest.[7] Below is a chart from the Examiner Report showing Spirit's operating results since the Fourth Quarter of 2023. [Second Bk. DE 595 at 15]. An operating loss occurs when core business income ends up being lower than expenses. In each quarter, Spirit had operating losses, not profits, and was the worst of the four ULCCs:

---

[6] *See* Q1 2025 Form 10-Q and Q2 2025 Form 10-Q. This equates to approximately $80 million in negative cash flow per month in the first half of 2025.

[7] See https://www.investopedia.com/terms/o/operating_profit.asp



40.     Thus, in each of the seven quarters leading up to Spirit's Second Bankruptcy, Spirit had a negative net operating margin of at least 10%.

41.     Spirit similarly had operating losses exceeding $100 million in each of the previous seven quarters leading up to the Second Bankruptcy.

| Reported Figures (in Millions of U.S. Dollars) | Q4 2023 | Q1 2024 | Q2 2024 | Q3 2024 | Q4 2024[8] | Q1 2025 | Q2 2025 | Q3 2025 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Operating Income (Loss) | (214.8) | (207.3) | (152.5) | (296.4) | (448.8) | (289.2) | (184.1) | (134.9) |
| Net Income (loss) | (183.7) | (142.6) | (192.9) | (308.2) | (585.3) | 61.3[9] | (245.8) | (317.5) |

[8] The operating income and net income figures for Q4 2024 were calculated by taking the total Operating Income and Net income, as reported in Spirit Airlines, Inc.'s FY 2024 Form 10-K ($1,105 million and $1,229 million, respectively), and subtracting the Q1, Q2 and Q3 2024 reported losses.

[9] Spirit's net income in Q1 2025 was inflated due to a $421 million reorganization write off. Its day-to-day operations remained in a state of heavy losses.

15

42.     Below is a chart of Spirit's Historical Quarterly Revenue, which is from the Examiner Report and confirmed by Plaintiffs based on their review of Spirit's financial reporting, which shows Spirit's quarterly revenue in millions of dollars.  The data below show that Spirit's quarterly revenue declined by approximately 30% in the two years leading up to the Second Bankruptcy.



43.     Because of Spirit's high fixed costs and generally low profit margins as a ULCC, this revenue decline was devastating for Spirit.

**The Failed Aircraft Sale Agreement with GAT**

44.     Faced with increasing losses, on October 29, 2024, Spirit agreed to sell 23 of its A320/A321 Airbus jets to GAT for $519 million.  As Spirit stated in its First Bankruptcy, when it moved to authorize the GAT Aircraft Sale Agreement, it asserted that "a fundamental element of the Debtor's business plan and fleet strategy is the reduction of the overall size of the Debtor's fleet and related improvement in the Debtor's liquidity position."  [First Bk. DE 23 at 13 of 110]. The Company's announced fleet transformation was thus concretely tethered to the sale of these 23 jets.

45.     Of the 23 aircraft to be delivered—16 were A320-200 series and 7 were A321-200 series models.  Each engine was manufactured by IAE, which is majority owned by Pratt &

16

Whitney.  The A320-200 aircraft were equipped with the V2527-A5 engines; the A321-200 aircraft were equipped with the V2533-A5 engines.

46.     According to the Aircraft Sale Agreement dated October 29, 2024, and authorized in the First Bankruptcy, the sale was conditioned on the buyer's inspection and technical acceptance, which was described in Exhibit D in the purchase agreement.  That vital information was concealed by redaction in the version of the Aircraft Sale Agreement filed publicly as an exhibit to Spirit's FY 2024 Form 10-K, signed by Cromer and Christie, among others.  The aircraft sales were to proceed according to a set schedule in the Aircraft Sale Agreement.  Again, Defendants hid from investors the required schedule, replacing the "Scheduled Delivery Month" for each plane with three asterisks.  Although Spirit disclosed the body of the Aircraft Sale Agreement in its FY 2024 Form 10-K, it did not disclose the Inspection and Technical Acceptance Concerns or the delivery schedule.  In fact, as the Examiner Report explained, this sale to GAT failed in "early 2025" when "[n]umerous aircraft failed these inspections."  [Second Bk. DE 595 at 39].

47.     The acute risk of failing inspection was known to Defendants because the engine models from these aircraft to be sold in the Aircraft Sale Agreement had known un-contained failures and were subject to multiple Federal Aviation Administration ("FAA") Airworthiness Directives.  For example, in March 2020, V2527-A5 and V2533-A5 engines were ordered for inspections after a Vietnam Airlines A321 suffered un-contained engine failure during an aborted takeoff.[10]  In November 2024, the FAA announced that they would propose additional maintenance requirements on V2527-A5 and V2533-A5 engines.[11]

---

[10] https://samchui.com/2020/03/23/uncontained-a321-engine-failure-prompts-inspections/
[11] https://simpleflying.com/faa-inspections-airbus-a320ceo-v2500-engines-uncontained-failure/

48.     The Examiner Report also confirmed that the Aircraft Sale Agreement specified that the aircraft engines undergo borescope inspections to thoroughly identify defects in internal components that are not otherwise observable.  [Second Bk. DE 595 at 39-40].  As the Examiner detailed, numerous aircraft failed these inspections, and Spirit could not find sufficient repair slots in part because of known extended queues at Pratt & Whitney's engine maintenance affiliate, IAE.

49.     Spirit was particularly affected by known problems with Pratt & Whitney engines. Specifically, Spirit kept an average of 25 aircraft grounded during 2024 for operational service due to engine issues.  [Second Bk. DE 595 at 41].  Many of these related to a defect with Pratt & Whitney engines involving defective powdered metal coatings that was identified in 2023 and impacted at least 38 of Spirit's aircraft.  [Second Bk. DE 595 at 42].  While the Examiner Report did not indicate that the aircraft to be sold in the Aircraft Sale Agreement themselves contained defective powdered metal coatings, it did acknowledge the substantial engine repair backlog that impacted Spirit's ability to timely reserve ("slot") its engines for repair by IAE, the authorized repair facility.

50.     Spirit did not disclose during the Class Period that any of the aircraft designated for sale to GAT failed inspection and did not receive technical acceptance.  The Aircraft Sale Agreement was ultimately terminated on July 15, 2025, with only 3 of 23 planes being sold.  Spirit has never contended that GAT breached the Aircraft Sale Agreement, implicitly acknowledging that the 20 unsold aircraft failed to meet conditions precedent.

**Defendants Conceal Spirit's Plunging Liquidity**

51.     Spirit and Defendants could not avoid discussing liquidity in Spirit's SEC filings, so they discussed it inaccurately and omitted material adverse information.  Under Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") rules,

18

senior management is required to assess an entity's ability to continue as a going concern and provide related disclosures. The assessment covers a 12-month period that begins from the date the financial statements are issued (*i.e.*, when the 10-K or 10-Q is filed). ASC 205-40.[12] Under ASC 205-40, even if liquidation is not imminent, if conditions and events in the aggregate raise substantial doubt about the entity's ability to continue as a going concern over that period, those issues ***must*** be disclosed. *Id.* That management has come up with a plan that might address liquidity concerns does not excuse a lack of disclosure. Under ASC 205-40, even if it is probable that a mitigation plan will be effectively implemented AND it is probable that the plan will mitigate the conditions that raise the substantial doubt, the company must disclose the following in accordance with ASC 205-40-50-13:

- The principal conditions or events that raised substantial doubt, before consideration of management's plans;

- Management's evaluation of the significance of those conditions or events; and

- Management's plans that alleviated the substantial doubt.

52. The FASB defines "substantial doubt about an Entity's Ability to Continue as a Going Concern" as "when conditions and events, considered in the aggregate, indicate that it is probable that the entity will be unable to meet its obligations as they become due within one year after the date that the financial statements are issued (or within one year after the date that the financial statements are available to be issued when applicable)."[13]

53. As discussed in the Examiner Report, Spirit's liquidity plunged during the Class Period. Spirit's liquidity, which consisted of "unrestricted cash and cash equivalents, short-term

---

[12] *See* https://kpmg.com/kpmg-us/content/dam/kpmg/frv/pdf/2024/handbook-going-concern.pdf
[13] See https://asc.fasb.org/MasterGlossary

investment securities and funds available under our Exit Revolving Credit Facility" (see Q1 2025 Form 10-Q), declined from $882 million in March 2025 to just $800 million in April 2025.  By June, 2025, the Company was significantly below the Elavon threshold, with only $683 million in total liquidity.  See the below chart detailing month-by-month liquidity from the Examiner Report:



54.      The above chart includes short-term investments.  For example, on March 31, 2025, Spirit had $882.1 million in liquidity, consisting of $487.5 million in cash and cash equivalents; $119.6 million in short term investments; and $275 million from the Exit Revolving Credit Facility.  *See* Q1 2025 Form 10-Q.  As demonstrated above, Spirit was already under the $850 million covenant by April 2025.

55.      Spirit's cash dropped precipitously during the Class Period.  Below is a chart detailing the Company's cash decline in the first half of 2025:

| Cash as of | Reported in | Cash & cash equivalents |
|---|---|---|
| December 31, 2024 | FY 2024 Form 10-K | 902.1 |
| March 31, 2025 | Q1 2025 Form 10-Q | 487.5 |
| June 30, 2025 | Q2 2025 Form 10-Q | 407.5 |

56.     Thus, in the first six months of 2025, the Company burned through more than half of its unrestricted cash.

57.     As Spirit's SEC filings acknowledged, "the Company's credit card processors do not require the Company to maintain cash collateral, provided that the Company satisfies certain liquidity and other financial covenants." *See, e.g.*, Q1 2025 Form 10-Q.  Defendants did not disclose the Elavon terms or Spirit's liquidity covenant with Elavon to investors because doing so would reveal that Spirit was perilously close to breaching the covenant in the beginning of the Class Period and that it had in fact breached it by early in the Second Quarter.  In the post-Class Period Second Bankruptcy, the Examiner Report revealed that the Elavon agreement required Spirit to maintain $850 million in liquidity.  [Second Bk. DE 595 at 35].  Thus, even at the start of the Class Period, Spirit was at serious risk of breaching its liquidity covenant, which would lead to default and penalty holdbacks.  And by April, 2025, Spirit was below the $850 million threshold even including its $275 million credit facility.

58.     Worse still, Spirit's $275 million credit revolver contained its own $500 million liquidity requirement, and Spirit's $840 million in secured notes had a $450 million liquidity requirement.[14]  The Q1 2025 Form 10-Q said nothing about these liquidity amounts.  As Spirit later admitted in its Q2 2025 Form 10-Q, the failure to maintain liquidity covenants constituted a default under these loan agreements and the credit card processing agreement, which subjected the Company to acceleration of these debt obligations.

---

[14] https://ratings.moodys.com/ratings-news/449168

59.     The concerns were not merely hypothetical: on August 15, 2025, left with no other options, Spirit agreed to pay Elavon $50 million and on August 20, 2025, allowed Elavon to hold back $3 million per day to continue processing credit cards in the wake of Spirit's breach of the liquidity covenant.

60.     Defendants omitted each of these known risks when discussing their liquidity in Class Period 10-Qs.  As detailed above, Spirit referenced the fact of a liquidity covenant with its credit card processor in periodic filings but hid the terms so that investors could not see that a breach was imminent in the beginning of the Class Period and had occurred by Q2 2025.  Instead, Defendants touted Spirit's liquidity and claimed that the Company was able to function as a going concern for the coming twelve months, supposedly having emerged from bankruptcy as a "stronger" Company. In addition, SEC 8-K Item 2.04 ("Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement") also required disclosure of any breach of these covenants. But for several months, Defendants did not disclose that their liquidity had fallen below the covenant threshold.

61.     Nor were Spirit's problems limited to the liquidity covenant in the Elavon agreement.  Even at the cash burn rate that Spirit experienced at the beginning of the Class Period (which worsened as time progressed), *see* ¶¶53-55, Defendants knew Spirit would breach the $500 million liquidity threshold needed to tap its credit facility before the end of September 2025. Again, instead of admitting this known risk from investors, Defendants omitted disclosing the specific liquidity threshold when discussing the credit facility in its periodic filings.

## II.     Materially False and Misleading Statements Issued During the Class Period

~~26.~~62. The Class Period begins on March 12, 2025, the day the First Bankruptcy court determined that Spirit satisfied the conditions precedent to consummation of a pre-arranged Plan

of Reorganization and emerged from Chapter 11 bankruptcy protection. ~~In connection with the foregoing, Former Spirit completed a corporate reorganization pursuant to which Spirit became the new parent company of the Corporate Debtors, with Former Spirit becoming a wholly owned subsidiary of Spirit and converted from a Delaware corporation to a Delaware limited liability company.~~

~~27.     On April 29, 2025, Spirit's common stock began publicly trading on the NYSE under the ticker symbol "FLYY."~~

~~28.     Thereafter, at all relevant times, Defendants touted their purported plan to enhance Spirit's liquidity, financial condition, and business operations, as well as the purported positive impacts these measures were having the Company's business and financial results. In so doing, Defendants indicated to investors and the market that Spirit's business had emerged from bankruptcy protection on improved financial footing, with the requisite corporate strategy and means to operate as a publicly traded company.~~

~~**Materially False and Misleading Statements Issued During the Class Period**~~

~~29.     The Class Period begins on May 28, 2025, the day after Spirit issued a press release during after-market hours announcing its receipt of a delinquency notice from the NYSE for its failure to timely file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2025 (the "Q1 2025 10-Q"). The press release assured investors, in relevant part, that "[t]he Company continues to develop and implement the changes to its business necessary to return to profitability."~~

~~30.     The same press release also quoted Defendant Davis as stating[15]:~~

---

~~[15] All emphases herein are added unless otherwise indicated.~~

23

63.     ~~While there's lots to do,~~ On that day, March 12, 2025, Spirit issued a press release announcing that it had emerged from bankruptcy, entitled: "Spirit Airlines Emerges from Financial Restructuring, Better Positioned to Advance its Transformation and Enhanced Guest Experience." In that press release, Christie said the following regarding the Company's financials:

> "***We're pleased to complete our streamlined restructuring and emerge in a stronger financial position to continue our transformation and investments in the Guest experience*** … Throughout this process, we've continued to make meaningful progress enhancing our product offerings, while also focusing on returning to profitability and positioning our airline for long-term success. Today, we're moving forward with our strategy to redefine low-fare travel with our new, high-value travel options."

64.     The statements in Paragraph 63 above were materially false and misleading when made because: (a) the Company had not emerged in a "stronger financial position" but rather was already in a position where it was facing an imminent breach of its liquidity covenants; (b) at the very least, it was deceptive to discuss a strong financial position without discussing known risks including liquidity covenants and known impediments to a blockbuster announced plane sale; (c) Spirit was faced with an imminent default of its debt and credit card processing agreements and thus did not then have a path to keep itself afloat let alone to return to profitability; and (d) the statements omitted that Spirit had already failed to deliver nearly all of the jets in the Aircraft Sale Agreement and had not restored the majority of aircraft to saleable condition.

65.     Analysts reacted favorably to the news.  For example, S&P upgraded Spirit's credit rating, noting that "[t]he emergence from creditor protection has reduced Spirit's debt levels and improved its liquidity position."[16]

66.     On April 17, 2025, Spirit announced that Davis had been hired as CEO, replacing Christie, who resigned days earlier.  The Company's April 17, 2025, press release announcing

---

[16] https://www.spglobal.com/ratings/es/regulatory/article/-/view/type/HTML/id/3340434

Davis's appointment stated that Davis would "develop, convey and execute a powerful new plan that will propel Spirit forward."[17] As Cromer informed the Examiner in the Second Bankruptcy following the Class Period, immediately after being hired, Davis began assessing the fleet plan. [Second Bk. DE 595 at 108].

67.     In a May 27, 2025, press release, Davis said the following about the Company's fleet:

> "*I'm pleased with our progress in driving change to our fleet, our product and our market positioning.*  The Spirit team has faced down tough challenges before, and I'mI'm gratified to see such a strong focus and commitment[.]."

68.     The statements in Paragraph 67 above were materially false and misleading when made because they omitted to disclose that: (a) a substantial portion of Spirit's fleet was grounded due to the known Pratt & Whitney engine issues; and (b) the largest announced fleet change, the Aircraft Sale Agreement, was then imperiled because Spirit had not restored the majority of the to-be-sold aircraft to saleable condition and had not even obtained repair slots for vital engine repairs.

69.     On May 30, 2025, Spirit filed its Q1 2025 Form 10-Q with the SEC. for the quarter ending March 31, 2025.  Contrary to its rosy projections in the First Bankruptcy filings, Spirit revealed an operating income of negative $289 million for that quarter, which was $82 million worse than the prior year period.  Defendants Cromer signed the Q1 2025 Form 10-Q, and both Davis and Cromer certified that the financial information in the Q1 2025 Form 10-Q was accurate and that the Q1 2025 Form 10-Q did not contain any untrue statement of material fact.

---

[17] https://ir.spirit.com/news/news-details/2025/Spirit-Airlines-Appoints-Airline-Industry-Leader-Dave-Davis-as-President-and-CEO/default.aspx

31.70.  With respect to Spirit's purported ability to continue as a going concern, the Q1 2025 Form 10-Q stated, in relevant part:

Management has assessed the impact of the current pricing environment on its liquidity requirements over the next 12 months. Based on such evaluation, *we have concluded that it is probable we will have sufficient liquidity to meet our future cash needs with cash and cash equivalents, cash flows from operations, and management's current plans*, including the implementation of network and product enhancements, including to our Go Comfy travel option, the execution of planned sale leaseback transactions related to certain of our owned spare engines, and the renegotiation of terms with our credit card processor and/or other parties to facilitate payment processing.

\* \* \*

*Our condensed consolidated financial statements have been prepared assuming that we will continue to operate as a going concern, which contemplates the continuity of operations, realization of assets and liquidation of liabilities in the normal course of business*, and does not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classifications of liabilities that may result from uncertainty related to our ability to continue as a going concern.

71.      Likewise, the Q1 2025 10-Q touted that "*[w]e*The statements in Paragraph 70 above were materially false and misleading when made because they omitted to disclose that: (a) by the end of the First Quarter of 2025, and the filing date of May 30, 2025, the Company's available cash was already below the liquidity covenant in the Elavon agreement, which made Defendants' statements about having sufficient liquidity to operate for the "next 12 months" misleading when made; (b) by the reporting date of May 30, 2025, the Company's liquidity, even including the $275 million Exit Revolving Credit Facility, was already below the $850 million threshold, which meant this statement was outright false under ASC 205-40; (c) at the end of Q1, while total liquidity may then have been modestly above the $850 million threshold in the Elavon agreement, the Company was burning cash at a rate that gave them no reasonable basis to believe that the Company could avoid breaching the threshold in the coming twelve months; (d) the Company also had liquidity

covenants with its lenders that it was not then in a position to avoid breaching in the coming 12 months especially once it defaulted on the Elavon agreement and incurred penalties and holdbacks associated therewith; (e) the Company had not then obtained any renegotiation of the liquidity threshold with Elavon and had no reasonable basis to believe it could obtain renegotiation of the threshold without making substantial cash payments and exposing itself to extensive holdbacks from Elavon, both of which would further erode its liquidity position; (f) planned generation of cash from a $519 million aircraft sale was already imperiled as 21 of the 23 aircraft had not been delivered and most of the undelivered planes were not then in saleable condition (and Spirit had not procured repair slots at the engine servicing agent necessary to restore the engines); (g) several of the undelivered planes under the Aircraft Sale Agreement had already failed inspection; and as a result (h) management's assurances about liquidity were false and misleading when made.

72.     With respect to the Company's credit card processing agreement, the Q1 2025 Form 10-Q said, "the Company's credit card processors do not require the Company to maintain cash collateral, provided that the Company satisfies certain liquidity and other financial covenants…. As of March 31, 2025 and 2024, the Company was in compliance with the liquidity and other financial covenants in its credit card processing agreement."

73.     The statement in Paragraph 72 above was materially misleading when made because it omitted to disclose that: (a) the Company had already breached the liquidity covenant as of the May 30, 2025 filing date of the Q1 2025 Form 10-Q, or at worst was perilously close to doing so; (b) its liquidity was already under $850 million by April 2025; and (c) even if the Company had been in compliance with the liquidity covenant on March 31, 2025, it was burning cash at a rate that made a breach of that covenant virtually certain by the end of Q2 2025, which was only a month away.

74.     The Q1 2025 Form 10-Q also discussed the Aircraft Sale Agreement but omitted the most important information necessary to make the statement not misleading under the circumstances:

**Loss (Gain) on Disposal**

During the Current Predecessor Period, the Company recorded a loss of $11.7 million within loss (gain) on disposal of assets in the condensed consolidated statements of operations.

*Loss (gain) on disposal of assets for the Current Predecessor Period included an $18.5 million adjustment to impairment charges recorded during the fourth quarter 2024 related to change in estimates of costs to sell. These charges are associated with the Company's plan to early retire and sell 23 A320ceo and A321ceo aircraft, in accordance with the aircraft sale and purchase agreement with GAT entered into on October 29, 2024.*

75.     The statement in Paragraph 74 above was materially misleading when made because it omitted to disclose that: (a) Spirit had already failed to deliver 21 of the 23 aircraft at the times required by the Aircraft Sale Agreement; (b) the failure to complete these sales was already creating a liquidity crisis at the Company; (c) many of the subject aircraft had failed inspections required for sale; (d) the Company had not maintained the majority of the subject aircraft in saleable condition; (e) the Company had not secured maintenance slots with the engine servicing agent necessary to repair the engines of the aircraft to be sold, which were subject to FAA scrutiny including extensive ordered repairs; (f) a severe backlog at the engine servicing agent, made worse by a widespread defect in metal powdered coatings in certain Pratt & Whitney engines that was known since 2023, made it extremely difficult to obtain near-term slotting for repairs; (g) the conditions of sale had not been met with respect to nearly all of the subject aircraft; and (h) as a result, the statement gave the impression that the Aircraft Sale Agreement was still

28

going to move forward as to the 23 aircraft when in fact only 2 of the 23 aircraft had been sold on schedule and at most, only one or two other planes would be sold in the coming months.

76.     Likewise, the Q1 2025 Form 10-Q downplayed liquidity concerns as a mere hypothetical when in fact that risk was imminent and was already then threatening the Company's ability to operate as a going concern:

***We are highly dependent upon our cash balances and operating cash flows.***

As of March 31, 2025, we had cash and cash equivalents of $487.5 million and $275.0 million available for borrowing under our Exit Revolving Credit Facility. We will continue to be dependent on our operating cash flows to fund our operations and to make scheduled payments on our aircraft-related fixed obligations and other debt obligations. However, we anticipate that we will need additional funds to finance our operations and our debt obligations.

~~32.~~     ***We* have implemented and continue to implement plans to improve our liquidity**, including the implementation of network and product enhancements, including to our Go Comfy travel option, the execution of planned sale leaseback transactions related to certain of our owned spare engines, and the renegotiation of terms with our credit card processor and/or other parties to facilitate payment processing, and enhancements to our ~~Go Comfy travel option."~~ Go Comfy travel option. However, there can be no assurance that we will be able to achieve our business plans or return to profitability. Further, we can give no assurances that we will be able to secure additional sources of funds to support our operations or refinance our existing indebtedness, or, even if such additional funds are available to us, that such additional financing will be on terms that are acceptable to us or sufficient to meet our needs***. If we are unable to raise sufficient capital or refinance our existing indebtedness when needed, our business, financial condition and results of operations will be materially and adversely affected, and we may need to significantly modify our operational plans to continue as a going concern. In addition, our credit card processors are entitled to withhold receipts from customer purchases from us, under certain circumstances. If we fail to maintain certain liquidity and other financial covenants, their rights to holdback would become operative, which would result in a reduction of unrestricted cash that could be material. Inadequate liquidity may materially adversely affect our share price and our ability to raise new capital or to enter into or amend critical contractual relations with third parties due to concerns about our ability to meet our contractual obligations.***
~~33.     The Q1 2025 10-Q also made various other representations regarding Defendants'~~

~~strategy to purportedly enhance the Company's liquidity and set a foundation for its future~~

29

~~success, stating, *inter alia*, that "we implemented several strategic changes aimed at driving higher unit revenues and improving profitability" and have "decided to reduce our capacity and re-align our network to enhance operational reliability, focusing on markets where industry capacity and demand are better aligned."~~

~~34.    Further, the Q1 2025 10-Q touted that "[o]ur cost structure has consistently been among the lowest in the U.S. airline industry, which is one of our key competitive advantages" and "has allowed us to offer low fares, drive traffic volume, increase market share and protect profitability."~~

~~Appended as exhibits to the Q1 2025 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants~~

77.    The statements in Paragraph 76 above were materially false and misleading when made because: (a) by the end of the First Quarter of 2025, the Company's available cash excluding the Exit Revolving Credit Facility was already below the liquidity covenant in the Elavon agreement, which made Defendants' statements regarding potential risk of not having enough cash misleading when made; (b) the Company's negative cash flows from operations had already launched the Company into a looming liquidity crisis with its lenders, with whom it had $450 million and $500 million liquidity covenants; (c) at the then current-rate of cash burn, the Company lacked liquidity to continue to operate for more than a few months, especially once it faced the repercussions of its imminent breach of the Elavon agreement; (d) a planned infusion of cash from a $519 million aircraft sale was already imperiled as 21 of the 23 aircraft had not been delivered and most of the undelivered planes were not then in saleable condition (and Spirit had not procured maintenance slots at the engine servicing agent necessary to restore the engines); (e) several of the undelivered planes under the Aircraft Sale Agreement had already failed inspection and nearly all would not be sold due to failed inspections; and as a result (f) their assurances that "*we have*

*implemented and continue to implement plans to improve our liquidity*" were misleading when made.

~~35.~~78.   Davis and Cromer certified that the Q1 2025 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

~~36.   The statements referenced in ¶¶ 29-35 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Spirit was at substantial risk of being unable to meet certain of its debt and other financial obligations; (ii) Spirit was also at substantial risk of being forced to file for Chapter 11 bankruptcy protection within a mere matter of months; (iii) accordingly, Defendants had overstated enhancements to Spirit's financial condition, liquidity, and overall business and operations, while simultaneously downplaying the negative impacts of adverse market conditions on the same; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.~~

### ~~The Truth Emerges~~

79.   The statements in Paragraph 78 above were materially misleading when made because they omitted to disclose that: (a) by the end of the First Quarter of 2025, the Company's available cash was already below the liquidity covenant in the Elavon agreement, which made

31

Defendants' statements about a potential risk of not having enough cash misleading when made; (b) the Company's negative cash flows from operations were already putting the Company into a looming liquidity crisis with its lenders, with whom it had $450 million and $500 million liquidity covenants; (c) at the then current-rate of cash burn, the Company lacked liquidity to continue to operate for more than a few months, especially once it faced the repercussions of its imminent breach of the Elavon agreement; (d) the planned infusion of cash from a $519 million aircraft sale was already imperiled as 21 of the 23 aircraft had not been delivered and most of the undelivered planes were not then in saleable condition (and Spirit had not procured maintenance slots at the engine servicing agent necessary to restore the engines); (e) several of the undelivered planes under the Aircraft Sale Agreement had already failed inspection and nearly all would not be sold due to failed inspections; and as a result (f) their assurances that the report "***does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made***" were grossly misleading.

### III.     The Truth Begins to Emerge

80.     On August 11, 2025, during after-market hours, Spirit filed ~~a quarterly report on~~its Q2 Form 10-Q with the SEC for the period ~~ended June 30, 2025 (the "Q2 2025 10-Q"), in which Defendants~~ending June 30, 2025.  Cromer signed the Q2 Form 10-Q, and both Davis and Cromer certified that the financial information in the Q1 2025 Form 10-Q was accurate and that the Q1 2025 Form 10-Q did not contain any untrue statement of material fact.  The Q2 2025 Form 10-Q noted that its liquidity as of June 30, 2025 had dropped to $407.5 million in cash and $275.0 million available under the Exit Revolving Credit Facility.  At this point, its total liquidity, unrestricted

cash ($407.5 million), and its Exit Revolving Credit Facility ($275 million) totaled $682.5 million—below the $850 million liquidity covenant referenced in its contract with Elavon.[18]

37.81. The Q2 2025 Form 10-Q disclosed that "there is substantial doubt as to the Company's ability to continue as a going concern within 12 months[.]" In particular, the Q2 2025 Form 10-Q stated, in relevant part:

> *[T]he Company has continued to be affected by adverse market conditions, including elevated domestic capacity and continued weak demand for domestic leisure travel in the second quarter of 2025, resulting in a challenging pricing environment.* As a result, the Company continues to experience challenges and uncertainties in its business operations and expects these trends to continue for at least the remainder of 2025.
>
> The Company has already taken certain measures to address these challenges, including the implementation of network and product enhancements, including its Premium Economy travel option, consummation of sale-leaseback transactions related to certain of its owned spare engines, and other discretionary cost reduction strategies, including the pilot furloughs announced in July 2025. *After considering the measures taken, minimum liquidity covenants in the Company's debt obligations and credit card processing agreement require financial results to improve at a rate faster than what the Company is currently anticipating.* As a result, the Company plans to take additional liquidity enhancing measures, which may include the sale or other monetization of certain aircraft and real estate, the sale of excess airport gate capacity, elimination of certain fixed costs and other transactions to raise additional liquidity. The Company is in discussions with various stakeholders related to some of these future initiatives. The Company is also in discussions with representatives of its credit card processor, which has requested additional collateral to renew its credit card processing agreement, which expires on December 31, 2025. The level of collateral required to be posted could result in a material reduction of unrestricted cash. While it is the Company's goal to execute on these initiatives, there can be no assurance that such initiatives will be successful.
>
> *If these initiatives are unsuccessful, management believes it is probable that the Company will be unable to comply with the minimum liquidity covenants under the Company's debt obligations and credit card processing agreement at some point in the next 12 months, which would result in an event of default* (in the case of the Exit Revolving Credit Facility, if there are amounts drawn and outstanding under the Exit Revolving Credit Facility at that time), which could cause the

---

[18] According to Spirit's Q2 2025 Form 10-Q, it no longer had any short-term investments by June 30, 2025.

maturity of the Company's debt obligations to be accelerated. ***Because of the uncertainty of successfully completing the initiatives to comply with the minimum liquidity covenants and of the outcome of discussions with Company stakeholders, management has concluded there is substantial doubt as to the Company's ability to continue as a going concern within 12 months from the date these financial statements are issued.***

38.82.  Following the filing of the Q2 2025 Form 10-Q, Spirit's stock price fell $1.44 per share, or 40.68%, to close at $2.10 per share on August 12, 2025.

83.     *That same*However, Defendants muted further declines by concealing the full truth. In particular, with respect to Elavon, the Q2 2025 Form 10-Q stated that "[a]s of June 30, 2025 and 2024, the Company was in compliance with the liquidity and other financial covenants in this credit card processing agreement."  This appears to be outright false, *see* ¶53.  If by some technical loophole it was not entirely a lie, it was misleading as a result of omitting that the Company had already breached the covenant by the time of filing or was then on the path to breach within the next two weeks.

84.     The statement in Paragraph 83 was further misleading because: (a) the Company's negative cash flows from operations were already putting the Company into a looming liquidity crisis with its lenders, with whom it had $450 million and $500 million liquidity covenants; (b) at the rate of the Company's cash burn, it could not operate for more than a couple of weeks; (c) a key part of its planned generation of cash, the $519 million Aircraft Sale Agreement, was already terminated as 21 of the 23 aircraft had not been delivered and nearly all had failed inspections, the direct result of Spirit having failed to maintain the planes in saleable condition or to secure maintenance slots with the engine servicing agent for repair; and as a result, (d) the assurances that "the Company was in compliance with the liquidity and other financial covenants in this credit card processing agreement" were misleading when made.

34

85.     Davis and Cromer each certified that the Q2 2025 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

86.     The statements in Paragraph 85 above were materially misleading when made because they omitted to disclose that: (a) the Company's available cash was already below the liquidity covenant in the Elavon agreement, which made Defendants' statements about a potential risk of not having enough cash misleading when made; (b) the Company's negative cash flows from operations were already putting the Company into a looming liquidity crisis with its lenders, with whom it had $450 million and $500 million liquidity covenants; (c) at the rate of the Company's cash burn, it could not operate for more than a couple of weeks; (d) a key part of its planned generation of cash, the $519 million Aircraft Sale Agreement, was already terminated as 20 of the 23 aircraft had not been delivered and numerous jets had failed inspections, the direct result of Spirit having failed to maintain the planes in saleable condition or to secure maintenance slots with the engine servicing agent for repair; and as a result (e) their assurances that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made" were grossly misleading.

87.     Defendants also did not disclose that Spirit had already hired bankruptcy counsel months before and that it had already hired financial advisers more than a month, before to guide the Second Bankruptcy.

88.    On August 22, 2025, *The Wall Street Journal* reported that Spirit had retained advisers to explore the Second Bankruptcy.  On this news, the stock price dropped over 14% the next trading day, closing at $1.41 per share on August 25, 2025.  However, representatives from the Company refused to answer questions as to whether the Company would declare bankruptcy.  For example, when asked about a potential second bankruptcy by Ch-aviation, a subscription airline data and intelligence provider, a Spirit representative said in an article published on August 25, 2025:  "[w]e will not comment on market rumors and speculation," thus blunting further decline if that Company had been more forthcoming about its plans.

39.89.  Less than three weeks after discussing liquidity as a problem that *may* emerge in "the next 12 months," on August 29, 2025, during after the market hoursclosed, Spirit issued a press release revealing that it had already filed for Chapter 11 bankruptcy protectionthe Second Bankruptcy, stating, in relevant part:

> Spirit . . . is executing a comprehensive restructuring of the airline to position the business for long-term success. ***To facilitate the process, the Company has filed voluntary petitions for Chapter 11 in the U.S. Bankruptcy Court for the Southern District of New York*** (the "Court").
>
> ***Spirit intends to use the Chapter 11 process to implement the broad changes necessary to transition the Company for a sustainable future*** and position it to deliver the best value in the sky for years to come. The Company has been actively engaged with certain of its largest lessors, secured noteholders and key stakeholders over the past few months as it works to refine its path forward. ***The Chapter 11 process will provide Spirit the tools, time and flexibility to continue ongoing discussions with all of its lessors, financial creditors and other parties to implement a financial and operational transformation of the Company.*** The Company is also working productively with its secured noteholders, including with respect to potential financing that may become necessary later in the proceedings.

40.90.  The same press release quoted Defendant Davis as stating, in relevant part:

> Since emerging from our previous restructuring, which was targeted exclusively on reducing Spirit's funded debt and raising equity capital, ***it has become clear that***

36

*there is much more work to be done* and many more tools are available to best position Spirit for the future . . . . *After thoroughly evaluating our options and considering recent events and the market pressures facing our industry, our Board of Directors decided that a court-supervised process is the best path forward to make the changes needed to ensure our long-term success.* We have evaluated every corner of our business and are proceeding with a comprehensive approach *in which we will be far more strategic about our fleet, markets and opportunities* in order to best serve our Guests, Team Members and other stakeholders.

~~41.~~91.  ~~On the next~~No trading ~~day,~~occurred on September 2, 2025, because the NYSE suspended trading of Spirit's common stock.  ~~As Spirit explained in an SEC filing on September 3, 2025:~~

~~On September 2, 2025, Spirit . . . received a notice from the staff of [the NYSE Regulation] that it~~ ~~*had determined to commence proceedings to delist the common stock, par value $0.0001, of the Company (the "Common Stock") from [the] NYSE . . . and that*~~When trading ~~*in the Common Stock was suspended immediately*~~resumed the following day on ~~*September 2, 2025*~~. ~~NYSE Regulation reached its decision that the Company is no longer suitable for listing pursuant to Section 1003(c)(iii) of the NYSE American Company Guide after the Company disclosed in its August 29, 2025 Current Report on Form 8-K that the Company filed a voluntary petition for reorganization under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "Chapter 11 Case") on August 29, 2025.~~

~~*NYSE American will apply to the [SEC] to delist the Common Stock upon completion of applicable procedures. The Company does not intend to appeal the determination and, therefore, it is expected that the Common Stock will be delisted from NYSE American.* As~~the OTC market, as a result of the ~~suspension and expected delisting, the Common Stock is expected to commence trading in the OTC market.~~ ~~*The OTC market is a significantly more limited market than NYSE American, and quotation on the OTC market likely results in a less liquid market for existing and potential holders of the Common Stock to trade in the Common Stock and could further depress the trading price of the Common Stock.*~~ ~~The Company can provide no assurance that its Common Stock will continue to trade on this market, whether broker-dealers will continue to provide public quotes of the Common Stock on this market, or whether the trading volume of the Common Stock will be sufficient to provide for an efficient trading market.~~

~~42.~~92.  ~~Following the~~ foregoing disclosures~~ and developments~~, Spirit's stock price fell ~~$0.71 per share, or~~ 58.~~2~~20%, to close at $0.51 per share on September 3, 2025~~— the first day that~~

37

the Company's common stock began trading on the OTC market under the ticker symbol "FLYYQ.".

43.93.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**Regulation S-K Items 105 and 303**

44.    Throughout the Class Period, Spirit's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Spirit to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants failed to disclose that Spirit was at substantial risk of being unable to meet certain of its debt and other financial obligations and, accordingly, was also at substantial risk of being forced to file for Chapter 11 bankruptcy protection within a mere matter of months.  Defendants also failed to disclose, *inter alia*, the true scope and severity of the negative impacts that adverse market conditions were having on Spirit's financial condition, liquidity, and overall business and operations.  Defendants' failure to disclose the foregoing issues violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

45.    For similar reasons, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Spirit to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

~~Defendants' failure to disclose, *inter alia*, the issues described *supra* at ¶ 44 violated Item 303~~ ~~because these issues represented known trends and uncertainties that were likely to have a~~ ~~material unfavorable impact on the Company's business and financial results.~~

## IV.     ~~SCIENTER~~ADDITIONAL **ALLEGATIONS** OF SCIENTER

~~46.     During the Class Period, Defendants had both the motive and opportunity to~~ ~~commit fraud.  They also had actual knowledge of the misleading nature of the statements they~~ ~~made, or acted in reckless disregard of the true information known to them at the time.  Indeed,~~ ~~given that Spirit's business had emerged from Chapter 11 bankruptcy protection and resumed~~ ~~public trading on a major stock exchange a mere matter of months earlier, Defendants were~~ ~~undoubtedly highly focused on the Company's ability to continue operating as such and avoid~~ ~~the need for refiling for Chapter 11 bankruptcy protection while they were disseminating the~~ ~~materially false and misleading statements alleged herein.  Accordingly, Defendants participated~~ ~~in a scheme to defraud and committed acts, practices, and participated in a course of business~~ ~~that operated as a fraud or deceit on purchasers of the Company's securities during the Class~~ ~~Period.~~

### A.  Defendants had Actual Knowledge of the Information They Concealed From Investors

94.     Before, during, and after the Class Period, Defendants made statements demonstrating actual knowledge of the underlying facts that rendered their representations regarding the Company's liquidity misleading.  For example, Davis spoke repeatedly, both to investors and to his staff, about the Company's supposed "progress" in the change to the fleet in turning around the Company following the first bankruptcy.[19]  Davis also claimed to personally

---

[19] https://ir.spirit.com/news/news-details/2025/Spirit-Aviation-Holdings-Inc--Announces-Receipt-of-NYSE-American-Delinquency-Notification/default.aspx

spearhead optimization of the Company's fleet, and according to Cromer in his interview with the Examiner, Davis "'launched a complete review of the network optimization strategy' because he saw untapped value in network optimization that exceeded what the previous management team identified or was willing to pursue, including enhancing the benefits of Spirit's strongholds at LaGuardia Airport and Fort Lauderdale-Hollywood International Airport, moving toward more of a hub strategy." [Second Bk. DE 595 at 41] (quoting the Examiner's interview of Cromer). Additionally, Cromer told the Examiner that Davis also "implement[ed] network and product offering proposals, while also focusing on costs, capacity, and the Pratt & Whitney engine issues." *Id.* Davis was thus well-informed of the widespread issues with Spirit's fleet and the problems it was experiencing in selling off its fleet aircraft.

95. Davis also spoke with authority regarding the Company's bankruptcy risks. For example, on August 13, 2025, in a memo to employees shared with journalists, Davis downplayed the Company's bankruptcy concerns as a mere "phrase required by our outside auditors" but that he was "confident that we can build a Spirit that will continue to provide consumers the unmatched value… for many years to come." The fact that Davis spoke authoritatively regarding the Company's operations and downplayed bankruptcy concerns just before the Company filed for bankruptcy bolsters an inference of scienter.

96. Cromer has repeatedly declared his knowledge of the day-to-day operations of the Company and the financial reporting and has repeatedly made representations about the Company's liquidity in both the First and Second Bankruptcy docket. *See* [First. Bk. DE 2, 97; Second Bk. DE 19]. In each sworn declaration, he stated: "I am generally familiar with its day-to-day operations, businesses, and financial affairs, and the circumstances leading up to the Chapter 11 Cases." *See, e.g.*, [First. Bk. DE 2; Second Bk. DE 19, 290, 346, 541]. In the First

40

Bankruptcy, Cromer successfully urged the bankruptcy court in a sworn declaration to allow the Company to proceed with the GAT Aircraft Sale Agreement without encumbrances and explained that Spirit's business plan depended on the sale proceeding as scheduled.[20]  Cromer added that the "the Aircraft Sale Agreement is an essential step in the implementation of Spirit's business plan" and that "[i]t is imperative that Spirit is able to continue implementation of the sale and transfer of the Aircraft as soon as possible to not only avail Spirit of the immediate cost savings and bring in additional liquidity through each sale, but to also stay as close to schedule on the extremely complicated logistical exercise of preparing 23 aircraft for delivery in a particular order and timing to assist with technical operating requirements and to meet the inspection and delivery requirements set forth in the Aircraft Sale Agreement." *Id*.  That Cromer underscored the sale's importance in the First Bankruptcy, but not that the deal had fallen through when making statements to investors, suggests scienter.

97.    In the Second Bankruptcy, Cromer thoroughly detailed the Company's debts, revenue, and the failed GAT Aircraft Sale Agreement.  *See* Declaration of Fred Cromer In Support of the Chapter 11 Proceedings and First Day Pleadings (August 31, 2025).  [Second Bk. DE 19]. On February 11, 2026, Cromer declared in the Second Bankruptcy that "I believe that it is imperative" that Spirit be allowed to go forward with a new plan to auction off the 20 remaining jets that failed to sell in the GAT transaction.  [Second Bk. DE 771].

---

[20] *See* Declaration of Fred Cromer in Support of (I) Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to Assume and Perform Under Aircraft Sale Agreement with G.A. Telesis LLC (Including, Without Limitation, Selling Aircraft Free and Clear of Encumbrances) and (ii) Motion of the Debtor for Entry of an Order Authorizing the Filing of Certain Commercially Sensitive Information Under Seal, filed Nov. 25, 2024.  [First Bk. DE 97].

98.     Christie likewise spoke authoritatively on the Company's liquidity and supposed successful emergence from the First Bankruptcy.  For example, on February 20, 2025, when the Company announced the confirmation of the Plan of Reorganization, Christie said:

Today's approval is a major milestone as we progress toward the successful conclusion of our in-court process, [] … We will *emerge as a stronger airline with the financial flexibility* to continue providing Guests with enhanced travel experiences and greater value. Throughout this process, we've had virtually unanimous support from our bondholders, who recognize Spirit's value and potential. As we move forward, our leadership team remains focused on reducing costs while also advancing our strategic initiatives to transform our Guest experience and position Spirit for success."

99.     Further, as referenced, *supra* at Paragraph 63, Christie assured investors when the Company had emerged from the First Bankruptcy that Spirit was "in a stronger financial position" and that the Company was then "positioning our airline for long-term success" and "returning to profitability."

100.    In addition, Cromer represented in the First Bankruptcy that he and Christie had "actual knowledge" of the Company's affairs.  *See* [First Bk. DE 2, 115, 248, 268, 270].  Cromer also signed the Disclosure Statement on December 17, 2024, in which he represented that "the Debtors project Liquidity to grow from $913 million in Fiscal Year-End 2024 to $1.6 billion in Fiscal Year-End 2028."  [First Bk. DE 270 at 88 of 390].  Cromer also signed the Statement of Financial Affairs, filed on January 2, 2025, which included hundreds of pages of descriptions of the Company's assets and liabilities, and declared under penalty of perjury that "I have examined the information in this Statement of Financial Affairs and any attachments and have a reasonable belief that the information is true and correct."  [First Bk. DE 313 at 33 of 430].  The Statement of Financial Affairs did not disclose any issues with the GAT deal or that it was not proceeding as

scheduled or that the Company was unlikely to meet its minimum liquidity requirements with lenders and Elavon.

101.    Defendants' decision to speak at length about the Company's liquidity but selectively disclose positive information concerning the topic while concealing adverse facts enhances a strong inference of scienter.   Defendants either knew the facts they were misrepresenting and concealing or recklessly disregarded the truth of the information they presented while holding themselves out as reliable authorities thereon.

### B.  That the Misrepresentations Concerned the Core Operations of the Company Bolsters an Inference of Scienter

102.    As Spirit stated in its First Bankruptcy, when it moved to authorize the GAT Aircraft Sale, "a fundamental element of the Debtor's business plan and fleet strategy is the reduction of the overall size of the Debtor's fleet and related improvement in the Debtor's liquidity position." [First Bk. DE 23].[21]   That the Company's liquidity concerns were the most important issues at the Company coming out of the First Bankruptcy suggests Cromer, Davis, and Christie were paying attention to them.  The Examiner found that "[t]he written record, particularly Board presentations, show that Spirit knew it had to manage its liquidity to maintain compliance with the Elavon covenant, and that Spirit could not effectively operate without the Elavon credit card processing agreement remaining in place." [Second Bk. DE 595 at 124].  The Examiner Report noted that one interviewee described the potential loss of a credit card processing agreement as "fatal." *Id.* at 124 n.346.  The Examiner's conclusions regarding senior management's knowledge are compelling, and any opposite inference would make no sense.  Given Defendants' statements

---

[21] Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to Assume and Perform Under Aircraft Sale Agreement with G.A. Telesis LLC (Including, Without Limitation, Selling Aircraft Free and Clear of Encumbrances), filed on November, 18, 2024.

representing that they had such knowledge of the Company's liquidity after its First Bankruptcy, it would be absurd to assume they were unaware that the Company was approaching or already in default of its debt obligations by the beginning of the Class Period and that the situation was rapidly deteriorating.

### C. That Defendants Were Preparing for their Second Bankruptcy by June 2025 but did not Tell Investors Supports Scienter

103.    By Spring 2025, the Company had already started preparing for a second bankruptcy. That Davis and Cromer were expecting a bankruptcy well before their Going Concern disclosure in August 2025 is apparent from the invoicing records from Davis Polk as reported in the Second Bankruptcy. [Second Bk. DE 196 at page 48 of 57]. For example, according to sworn bankruptcy filings of Davis Polk Partner Marshall S. Huebner ("Huebner Declaration") in the Second Bankruptcy, from *June 10* to August 26, 2025, Davis Polk invoiced Spirit for a total of $4.97 million. *Id.* This total included $717,558.16 invoiced on June 10; $326,361.94 invoiced on July 7; and $434,137.41 invoiced on July 24. According to the Huebner Declaration, these were advance payments to maintain the Retainer in advance of the Second Bankruptcy. *Id.* Further, by July 2, 2025, the Company had retained PJT Partners to act as its investment banking adviser in the Second Bankruptcy. [Second Bk. DE 197]. That the Company was actively taking steps to prepare for a Second Bankruptcy, knowing they were in default of their liquidity covenants, yet chose not to tell investors the same information, bolsters the inference of scienter.

### D. Defendants' Hiding Terms of Spirit's Aircraft Sale Agreement Suggests Scienter

104.    Defendants chose to discuss the Aircraft Sale Agreement while knowing that the public version of that agreement in its FY 2024 Form 10-K redacted the aircraft inspection,

44

technical acceptance, and delivery terms to prevent investors from discovering the failure of the key aircraft sale.  Spirit relied on the consummation of this sale (which it had no reasonable basis to believe would be consummated) to project liquidity of $852 million.  *See* [Second Bk. DE 595 at 35, 39-40].  Defendants also did not disclose that numerous jets had failed the inspections; that failure was only revealed later, in the Examiner Report.  That the Defendants chose to withhold known inspection failures and the collapse of the determinative aircraft sale supports scienter.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

47.105.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Spirit securitiesAviation Holdings, Inc. stock (ticker: "FLYY") on the open market during the Class Period (the "Class");") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

48.106.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Spirit securities were actively traded on the NYSE during the Class Period.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Spirit or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49.107.        Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.108.        Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

51.109.        Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about theSpirit's business, operations, and management of Spirit;

- whether Defendants caused Spirit to issue false and misleading financial statementsmisrepresented Spirit's liquidity risk during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statementsmisrepresented known problems imperiling the Aircraft Sale Agreement during the Class Period;

- whether the prices of Spirit securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.110.        A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

53.111.       Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Spirit securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts and ratings agencies during the majority of the Class Period;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Spirit securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

54.112.       Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

55.113.       Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Plaintiffs' claims sound primarily in omission because Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

47

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

56.114.      Plaintiffs repeat and re-allege each and every allegation contained in ¶¶ 1-55the paragraphs above as if fully set forth herein.

57.115.      This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.116.      During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business whichdetailed above that operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and made untrue statements of material facts; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Spirit securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Spirit securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

59.117.      Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents

48

described above, including statements made to securities analysts and the media that were designed to influence the market for Spirit securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Spirit's finances and business prospects.

60.118.      By virtue of their positions at Spirit, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed such acts and omissions willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were beingthey misrepresented or omitted material facts as described above.

61.119.      Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Spirit, Defendants had knowledge of the details of Spirit's internal affairs.

62.120.      Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Spirit.  As officers and/or directors of a publicly-held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Spirit's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports,

releases and public statements, the market price of Spirit securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Spirit's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Spirit securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

63.121.        During the Class Period, Spirit securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Spirit securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Spirit securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Spirit securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

64.122.        By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.123.        As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the

disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against Defendants)

66.124.	Plaintiffs repeat and re-allege each and every allegation contained in ¶¶ 1-55the paragraphs above as if fully set forth herein.

67.125.	This Count is asserted against all Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

68.126.	During the Class Period, Defendants participated in the operation and management of Spirit, and conductedcontrolled the day-to-day direction and participated, directly and indirectly, in the conduct of Spirit's business affairs.  Because of their responsibilities, activities, and senior positions, they knew the adverse non-public information about Spirit's misstatement of incomeliquidity and expenses and false financial statementsAircraft Sale Agreement concealed from investors.

69.127.	As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to Spirit's financial condition and results of operationstransactions, and to correct promptly any public statements issued by Spirit whichthat had become materially false or misleading.

70.128.	Because of their positions of control and authority as senior officers, Defendants were able to, and did, control the contents of the various reports, press releases, and public filings whichthat Spirit disseminated in the marketplace during the Class Period concerning Spirit's results of operations.  Throughout the Class Period, Defendants exercised their power and authority to causein causing Spirit to engage in the wrongful acts complained of herein.

51

Defendants, therefore, were "controlling persons" of Spirit within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they culpably participated in the unlawful conduct alleged which artificially inflated the market price of Spirit securities.

71.129.        Each of the Defendants, therefore, acted as a controlling person of Spirit. By reason of their senior management positions and/or being directors of Spirit, each of the Defendants had the power to direct the actions of, and exercised the same to cause, Spirit to engage in the unlawful acts and conduct complained of herein.  Each ofSpecifically, Cromer and Davis signed the Company's SEC filings, and Christie and Cromer were held out as persons with "actual knowledge of the Company's affairs" in the First Bankruptcy and each Defendant served as an investor-facing officer of the Company.  Each of the Defendants exercised control over the general operations of Spirit and possessed the power to control the specific activities whichthat comprise the primary violations about which Plaintiffs and the other members of the Class complain.

72.130.        By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for theall primary violations committed by Spirit.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.        Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.        Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.        Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.        Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: ~~September 30, 2025~~February 27, 2026

Respectfully submitted,

**MILLER SHAH LLP**

By: */s/ Nathan C. Zipperian*
Nathan C. Zipperian
Jayne A. Goldstein
2103 N. Commerce Parkway
Ft. Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
nczipperian@millershah.com
jagoldstein@millershah.com

*Liaison Counsel for Plaintiffs*

**POMERANTZ LLP**
Joshua B. Silverman (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Jaime D. Nolasco Esquivel (*pro hac vice*)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email: jbsilverman@pomlaw.com
         boconnell@pomlaw.com
         jnolasco@pomlaw.com

Jeremy A. Lieberman
(~~*pro hac vice* application forthcoming~~)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com

53

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

Michael J. Boyle, Jr.
(*pro hac vice* application forthcoming)
Attorneys4200 Regent Street, Suite 200
Columbus, OH 43219
Tel: (614) 578-5582
mboyle@bgandg.com

*Co-Lead Counsel for Plaintiffs*

54