**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| TERRANCE MLECZKO and TM DEFENSE SOLUTIONS LLC, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID DAVIS, FREDERICK S. CROMER, and EDWARD M. CHRISTIE III, <br><br> Defendants. | Case No. 0:25-cv-61959-WPD |

**DEFENDANTS' MOTION TO DISMISS THE AMENDED**
**COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

**HILGERS PLLC**

Carly A. Kligler
Alec H. Schultz
3801 PGA Boulevard, Suite 600
Palm Beach Gardens, FL 33410
Telephone: (561) 485-1325
ckligler@hilgerslaw.com
aschultz@hilgerslaw.com

**DAVIS POLK & WARDWELL LLP**

Dana M. Seshens*
Daniel J. Schwartz*
Esther C. Townes*
*Admitted pro hac vice*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
esther.townes@davispolk.com

*Counsel for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 3

      A.   The Parties and Relevant Nonparties ................................................................. 3

      B.   Spirit's First Bankruptcy (Spirit 1) .................................................................. 3

      C.   Spirit's Disclosures Upon Emergence from Spirit 1 ........................................ 4

      D.   Spirit's Class Period Disclosures ..................................................................... 5

      E.   Second Spirit Bankruptcy (Spirit 2) & the Examiner's Investigation and Report .......... 6

      F.   The AC's Allegations ...................................................................................... 7

LEGAL STANDARDS .......................................................................................................... 8

ARGUMENT .......................................................................................................................... 8

    I.    Plaintiffs Fail to Plead Any Actionable Misstatement or Omission ................................. 9

      A.   Plaintiffs Fail to Allege Any Statement That Was False When Made .......................... 9

      B.   Plaintiffs Fail to Plead Any Actionable Omission ....................................................... 12

        1.   Plaintiffs Fail to Plead Any Actionable Omission Based on Spirit's  Alleged Liquidity Challenges and Liquidity Covenants ............................................. 13

        2.   Plaintiffs Fail to Plead Any Actionable Omission Based on the ASA ..................... 18

      C.   Certain Statements Are Nonactionable Corporate Puffery or Opinion ........................ 20

    II.   Plaintiffs Fail to Plead a Strong Inference of Scienter ..................................................... 22

    III.  Plaintiffs Fail to Plead "Controlling Person Liability" .................................................... 25

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

CASES

PAGE(S)

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................................................8

*Beleson v. Schwartz*,
    599 F. Supp. 2d 519 (S.D.N.Y. 2009)........................................................................ 25

*Brophy v. Jingbao Pharms., Inc.*,
    781 F.2d 1296 (11th Cir. 2015) ................................................................................ 23

*Bryant v. Avado Brands, Inc.*,
    187 F.3d 1271 (11th Cir. 1999) .................................................................................3

*Cambridge Ret. Sys. v. MEDNAX, Inc.*,
    2019 WL 4893029 (S.D. Fla. Oct. 3, 2019)............................................................10

*Carvelli v. Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) ....................................................................... *passim*

*City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc.*,
    649 F. Supp. 3d 1256 (S.D. Fla. 2023) ..............................................................18, 22

*Cutsforth v. Renschler*,
    235 F. Supp. 2d 1216 (M.D. Fla. 2002)....................................................................21

*Druskin v. Answerthink, Inc.*,
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) ....................................................................17

*Edwards v. McDermott Int'l, Inc.*,
    2022 WL 3927828 (S.D. Tex. Aug. 30, 2022) ........................................................24

*FindWhat Inv. Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ...............................................................................14

*In re Criimi Mae, Inc. Sec. Litig.*,
    94 F. Supp. 2d 652 (D. Md. 2000)......................................................................23, 24

*In re Eagle Bldg. Techs., Inc., Sec. Litig.*,
    319 F. Supp. 2d 1318 (S.D. Fla. 2004) ....................................................................11

*In re Equifax Inc. Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019)....................................................................17

*In re Galectin Therapeutics Sec. Litig.*,

843 F.3d 1257 (11th Cir. 2016) .................................................................................15, 18, 19

*In re Greenlane Holdings, Inc. Sec. Litig.*,
511 F. Supp. 3d 1283 (S.D. Fla. 2021) ...................................................................................9

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ........................................................................20

*Kadel v. Flood*,
427 F. App'x 778 (11th Cir. 2011) ..................................................................................22, 25

*Kosowsky v. Icahn Enters. L.P.*,
748 F. Supp. 3d 1303 (S.D. Fla. 2024) .................................................................................24

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024).............................................................................................................12

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2023) ................................................................................... *passim*

*Mulvaney v. GEO Grp., Inc.*,
237 F. Supp. 3d 1308 (S.D. Fla. 2017) .................................................................................14

*Omnicare, Inc. v Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................................................................................21

*Underwood v. Lampert*,
2004 WL 7332754 (S.D. Fla. Aug. 30, 2004)........................................................................17

*In re Winn-Dixie Stores, Inc. Sec. Litig.*,
531 F. Supp. 2d 1334 (M.D. Fla. 2007)................................................................9, 17, 19, 22

*Ziemba v. Cascade Int'l, Inc.*,
256 F.3d 1194 (11th Cir. 2001) ............................................................................................10

STATUTES

15 U.S.C. § 78j(b)..................................................................................................................... 8

15 U.S.C. § 78t(a) ..................................................................................................................... 8

15 U.S. Code § 78u-4................................................................................................................ 8

RULES

17 C.F.R. § 240.10b–5........................................................................................................... 8,13

Fed. R. Civ. P. 9....................................................................................................................... 9

**PRELIMINARY STATEMENT**

The federal securities laws protect against fraud in connection with securities transactions. They are not an insurance policy against management decisions or judgments that—in hindsight—turn out differently than anticipated.  Yet Plaintiffs' *entire case* is premised on such impermissible hindsight pleading.  Rather than plead contemporaneous facts raising an inference that nonparty Spirit Aviation Holdings, Inc. ("Spirit" or the "Company") or Defendants made a false or misleading statement or acted with the requisite intent to defraud, Plaintiffs rely almost exclusively on after-the-fact events to claim that certain statements about Spirit's liquidity and financial position must have been false when made because Spirit filed for bankruptcy a second time ("Spirit 2") only five months after emerging from its first bankruptcy ("Spirit 1").  That is woefully inadequate to state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  Spirit repeatedly and robustly disclosed that it was facing liquidity challenges, that management had taken and was continuing to take steps to address those challenges, that there was no assurance those efforts would succeed, and that, if the efforts were unsuccessful, Spirit's financial position would suffer material adverse consequences.  Nothing more was required.

Plaintiffs nevertheless challenge 11 cherry-picked statements in certain of Spirit's press releases and SEC filings.  These statements generally concern Spirit's financial position emerging from Spirit 1; changes to its fleet and product offerings; available liquidity as of Q1 2025; a downward adjustment to revenue booked from an aircraft sale (one of the liquidity improvement measures Spirit undertook in its reorganization plan); and certifications by Spirit's management that its 10-Q reports were, to their knowledge, accurate.  Plaintiffs' Amended Complaint ("AC") claims these statements were false and misleading principally because they failed to disclose that Spirit supposedly was facing an "imminent" liquidity crisis, details of certain liquidity covenants in financing agreements and Spirit's credit card processing agreement, and the status of the aircraft sales.  But Plaintiffs' theory turns on subsequent events that occurred only in mid-July 2025 (after

eight of the statements were made) and late August 2025 (after *all* of the statements were made). This is classic nonactionable fraud-by-hindsight. Indeed, Plaintiffs' claims suffer from numerous irreparable flaws that require dismissal with prejudice.

*First,* the AC does not plead any actionable misstatement or omission. Rather than plead with particularity, as required, why and how any alleged misstatement was false when made, the AC simply describes allegedly omitted information in generic terms. Plaintiffs otherwise improperly rely on the examiner's report in the Spirit 2 bankruptcy, attempting to plead falsity based on his after-the-fact review of the circumstances that led to two bankruptcies close in time. Plaintiffs similarly fail to allege that any statement was misleading by omission, as the purportedly undisclosed "facts" either were already disclosed, had not occurred (and thus could not have been disclosed), or had nothing to do with the challenged statements and therefore there was no duty to disclose them. Other alleged misstatements are nonactionable puffery or opinions.

*Second*, the AC does not plead factual allegations raising the requisite "strong" inference of scienter—i.e., that any Defendant made any of the challenged statements with actual intent to defraud or severe recklessness. Absent from the AC are any allegations of insider stock sales, confidential witness accounts, or contemporaneous facts that contradict Defendants' challenged statements—all traditional scienter allegations. Plaintiffs instead rely on Defendants' corporate titles and innocuous activities common to any public company executive—e.g., speaking "repeatedly" and "with authority" to investors, submitting declarations to the bankruptcy court, having knowledge of Spirit's day-to-day affairs and "core operations." If Plaintiffs' allegations were sufficient to plead scienter with particularity—which, as a matter of law, they are not— virtually every corporate executive would operate with scienter in the ordinary course of business.

For these reasons and those below, Plaintiffs' claims should be dismissed with prejudice.

## BACKGROUND[1]

### A.  The Parties and Relevant Nonparties

Co-lead Plaintiffs allegedly purchased securities issued by nonparty Spirit.  AC ¶ 28; DE 1 at 24–29; DE 13-3.  They purport to represent a class of those who bought Spirit stock between March 12, 2025 and August 29, 2025 ("Class Period").  AC ¶ 1.  Nonparty Spirit Airlines, LLC, a Spirit subsidiary, is an ultra-low-cost carrier airline, providing discount air transportation across the United States, the Caribbean, and Latin America.  *Id.* ¶¶ 3, 5.  In August 2025, Spirit sought Chapter 11 bankruptcy protection in New York (Spirit 2).  *Id.* ¶ 4.  This was Spirit's second bankruptcy filing since November 2024 (Spirit 1).  *Id.*  Defendants are current and former Spirit officers:  Edward Christie III was Spirit's President and CEO until April 7, 2025; David Davis has been Spirit's CEO since April 17, 2025; and Frederick Cromer was Spirit's Executive Vice President and CFO at all relevant times.  *Id.* ¶¶ 3, 29–31.

### B.  Spirit's First Bankruptcy (Spirit 1)

Following increased competition from mainline and low-cost airline carriers on domestic leisure routes, decreased demand, aircraft groundings following the COVID-19 pandemic, and inflation-driven higher operating costs in 2023 and 2024, Spirit filed for bankruptcy in November 2024 to attempt to restructure its debt obligations.  *Id.* ¶¶ 4, 36–38; Ex. 8 (Exam. R.) at 15–18.  In February 2025, the bankruptcy court approved a pre-arranged plan of reorganization based on a deal with substantially all Spirit bondholders.  AC ¶ 5; Ex. 8 (Exam. R.) at 2.  On March 12, 2025, Spirit emerged from bankruptcy.  It issued a press release at that time, which announced, among other things, that Spirit had completed "a consensual, deleveraging transaction that equitizes approximately $795 million of funded debt" and that, "[w]ith significantly less debt and greater

---

[1] These allegations are drawn from the AC, the documents incorporated by reference or integral thereto, and SEC filings.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).  Unless otherwise noted, all emphasis and alterations in citations are added while internal citations, quotations, and alterations are omitted.

financial flexibility," Spirit was "better positioned for long-term success."  AC ¶¶ 5, 62–63; Ex. 3 (Mar. 12, 2025 Press Release).

### C.  Spirit's Disclosures Upon Emergence from Spirit 1

On March 3, 2025, shortly before emerging from Spirit 1, the Company filed its 2024 Form 10-K annual report ("FY 2024 10-K").  The 10-K disclosed risks regarding the Company's liquidity and financial condition, including a "going concern" qualification.  Ex. 2 (FY 2024 10-K) at 23–24, 46–48, 74, 89–90.  Spirit also disclosed, among other things, that:

- upon emergence, Spirit's "current substantial indebtedness" will be "subject to compliance with certain covenants in the agreements governing the Exit Secured Notes and Exit Revolving Credit Facility."

- it was "highly dependent upon [its] cash balances and operating cash flows" and that, beyond the exit financing, "[w]e can give no assurances that we will be able to secure additional sources of funds to support our operations, or, if such funds are available to us, that such additional financing will be sufficient to meet our needs."

- with respect to its agreement with its credit card processor, Elavon ("Elavon Agreement")—which processes transactions arising from the purchase of air travel, baggage charges, and other ancillary services by customers—"[i]f we fail to maintain certain liquidity and other financial covenants, [Elavon's] rights to holdback [receipts from customer purchases] would become operative, which would result in a reduction of unrestricted cash that could be material."

(*Id*. at 47–48.)

Spirit further disclosed that, on October 29, 2024 (during Spirit 1), the Company had entered into an aircraft sale and purchase agreement ("ASA") with GA Telesis, LLC ("GAT") for the sale of 23 aircraft to GAT, two of which were sold in December 2024.  *Id.* at 9, 75, 92.  Spirit attached the ASA to the FY 2024 10-K with certain redactions for commercially sensitive terms, including Exhibit D to the agreement, which contained information regarding "Inspection and Technical Acceptance."  *Id.* Ex. 10.71 (ASA).  Public portions of the ASA disclosed, inter alia, that GAT had discretion to physically inspect each aircraft prior to purchase, *id.* ¶ 4.1; that aircraft would be delivered "as is," including as it related to "any [e]ngine" or other part, *id.* ¶ 5.1; and that

4

failure to deliver timely aircraft to GAT could constitute an event of default leading to termination of the agreement, *id.* at 2, 4, 6, & ¶¶ 7.2, ¶ 7.4(b).  Spirit also disclosed engine repair issues impacting its fleet capacity and engines manufactured by IAE and Pratt & Whitney ("P&W").  These included a rare condition in the powdered metal used to manufacture certain engines that would require removal and inspection of certain aircraft through at least 2026, supply chain delivery issues, and limited slots at maintenance, repair, and overall shops.  Ex. 2 (FY 2024 10-K) at 42, 59, 66.

### D.  Spirit's Class Period Disclosures

On May 30, 2025, Spirit filed its Form 10-Q for the quarter ending on March 31, 2025 ("Q1 2025 10-Q"), which included disclosures regarding its post-petition financial operations, liquidity, and ability to operate as a going concern.  Among other things, the Company further explained that:

- it "continued to be adversely affected by a challenging pricing environment and continue[d] to face challenges and uncertainties in [its] business operations" which it projected would continue "for at least" the rest of 2025.  Ex. 5 (Q1 2025 10-Q) at 48.

- Elavon (its credit card processor), "do[es] not require the Company to maintain cash collateral, *provided that the Company satisfies certain liquidity and other financial covenants*," that "[f]ailure to meet these covenants would provide the processors the right to put in place a holdback resulting in a commensurate reduction of unrestricted cash," but that, "[a]s of March 31, 2025 and December 31, 2024, the Company's credit card processors were holding back no remittances."  *Id.* at 27.

- management projected, based on their assessment of the pricing environment at the time and the Company's liquidity requirements over the next 12 months, that "it is probable that the Company will have sufficient liquidity" to meet its needs, but "can give no assurances that its current plans [to enhance liquidity] will be successful or that we will be able to secure additional sources of funds to support our operations, or, if such funds are available," that they will be on acceptable terms or sufficient.  *Id.* at 7; AC ¶ 70.

Following these disclosures, Spirit continued to experience financial and operational challenges.  On August 11, 2025, the Company filed its 10-Q for the quarter ended June 30, 2025

5

("Q2 2025 10-Q"), disclosing that it "continued to be affected by adverse market conditions, including elevated domestic capacity and continued weak demand for domestic leisure travel in the second quarter of 2025," which it expected "to continue for at least the remainder of 2025." Ex. 6 (Q2 2025 10-Q) at 8, 54–55; AC ¶ 81.  The Company further warned that:

- "[a]fter considering the [cost-cutting] measures taken, minimum liquidity covenants in the Company's debt obligations and credit card processing agreement require financial results to improve at a rate faster than what the Company is currently anticipating."

- it planned to take "additional liquidity enhancing measures" to address these continued challenges and was in discussions with various stakeholders, including Elavon, "which ha[d] requested additional collateral required to renew its credit card processing agreement" and that "[t]he level of collateral required to be posted could result in a material reduction of unrestricted cash."

- "[i]f these [liquidity enhancing] initiatives are unsuccessful, management believes it is probable that the Company will be unable to comply with the minimum liquidity covenants under the Company's debt obligations and [the Elavon Agreement] at some point in the next 12 months, which would result in an event of default. . . ."

- "[b]ecause of the uncertainty of successfully completing the initiatives to comply with the minimum liquidity covenants and of the outcome of discussions with Company stakeholders. . . there is substantial doubt as to the Company's ability to continue as a going concern within 12 months. . . ."

(*Id.*)  Following the filing of the Q2 2025 10-Q, Elavon required Spirit to make an additional $50 million payment and imposed a $3 million per day holdback as conditions to extend the Elavon Agreement.  AC ¶ 18.  Spirit also drew down 100% of the $275 million available under its revolving credit facility.  *See id.*  Plaintiffs themselves recognize that Spirit promptly disclosed these events on August 21, 2025.  *Id.*; *see also* Ex. 7 (Aug. 21, 2025 8-K) at 2.

### E.  Second Spirit Bankruptcy (Spirit 2) & the Examiner's Investigation and Report

As Spirit was renegotiating the Elavon Agreement and drawing on its credit facility, it was also negotiating with AerCap, one of its major lessors, on a fleet restructuring that would shrink the airline.  Ex. 8 (Exam. R.) at 44.  However, on August 25, 2025, AerCap unexpectedly issued a

6

termination notice under its aircraft leases, which "destabilize[ed]" the discussions and provided "little opportunity for Spirit to negotiate before having to issue an 8-K and inform[] the world it was locked in a catastrophic dispute with its largest lessor counterparty." *Id.* Fearing that other lessors would follow suit to avoid being "last in line"—essentially a "run on the bank" scenario—Spirit quickly filed a second bankruptcy case on August 29, 2025 (Spirit 2). *Id.* at 44–45.

In October 2025, the Spirit 2 bankruptcy court appointed an examiner ("Examiner") to independently investigate "the circumstances surrounding the bankruptcy refiling . . . approximately five months after" Spirit had emerged from Spirit 1. *Id.* at 1. After conducting an extensive review of public information and internal Company documents undertaking numerous witness interviews, the Examiner filed his report ("Examiner's Report") on December 15, 2025, concluding, among other things, that Spirit's "operational and financial deterioration" that preceded Spirit 2 "unfolded at a speed and scale that was not reasonably foreseeable" as of the Spirit 1 confirmation. *Id.* at 6.

### F.  The AC's Allegations

The AC challenges 11 statements made by Spirit or Defendants during the Class Period. These include two statements (one each) in press releases issued on March 12 and May 27, 2025, AC ¶¶ 63, 67; four statements in Spirit's Q1 2025 10-Q (filed May 31, 2025), *id.* ¶¶ 70, 72, 74, 76; and one statement in Spirit's Q2 2025 10-Q (filed August 11, 2025), *id.* ¶ 83. They also include Messrs. Davis's and Cromer's signed certifications that each of the 10-Q reports was accurate (two certifications for each 10-Q; four certifications total). *Id.* ¶¶ 78, 85.

Plaintiffs generally allege that these statements were false or misleading because they purportedly downplayed risks posed by Spirit's precarious liquidity position. Essentially, Plaintiffs' theory is that Spirit emerged from its Spirit 1 bankruptcy with insufficient cash or liquidity such that it was doomed to fall short of its liquidity projections due to the possible

occurrence of a speculative daisy-chain of uncertain events.  *Id.* ¶¶ 6–11.  But, as discussed herein, Spirit repeatedly and robustly disclosed the liquidity challenges it was facing, including the risks associated with its various liquidity covenants.  In addition, the AC's attempts to plead scienter are based exclusively on allegations about Defendants' titles and ordinary business activities and thus fall far short of the applicable high bar for pleading scienter with particularity.

## LEGAL STANDARDS

"To survive a motion to dismiss," a complaint must allege facts sufficient to state a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Conclusory allegations and hindsight pleading do not suffice.  *See, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1332 (11th Cir. 2019).  Fraud claims under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b-5, require, among other things, particularized allegations of a material misrepresentation or omission and allegations supporting a "strong inference" of scienter—i.e., "intent to defraud or severe recklessness." *Carvelli*, 934 F.3d at 1318, 1323 (citing, *inter alia*, 15 U.S.C. § 78u-4(b)(2)(A).)  Exchange Act claims, moreover, are subject to the strict pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"), which require particularized facts supporting each element of Plaintiffs' claims.  *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)*.*

## ARGUMENT

Plaintiffs' Section 10(b) claim fails because the AC does not plead (i) any actionable misstatement or omission or (ii) a strong inference of scienter.  With no primary violation, Plaintiffs' control person claims under Section 20(a), 15 U.S.C. § 78t(a), also must be dismissed.

I.      **Plaintiffs Fail to Plead Any Actionable Misstatement or Omission**

Plaintiffs' claims should be dismissed because they fail to plead any statement that is false or misleading and because several of the challenged statements are nonactionable as statements of vague corporate optimism (i.e., "puffery") or opinion.

A. **Plaintiffs Fail to Allege Any Statement That Was False When Made**

While the AC characterizes several of Defendants' statements as false, AC ¶¶ 63–64, 67–68, 70–71, 76–77, 83, Plaintiffs make minimal, if any, effort to specify how or why each statement was false when made.  Even when they do, their allegations are legally insufficient.  *First*, Plaintiffs challenge as false a March 12, 2025 press release quoting Mr. Christie's statement that, upon emergence from Spirit 1, the Company was "pleased to complete [its] streamlined restructuring and emerge in a stronger financial position to continue [its] transformation and investments in the Guest experience."  AC ¶ 63.  Plaintiffs allege that Spirit had not emerged from Spirit 1 in a "stronger financial position" and "was already in a position where it was facing an imminent breach of its liquidity covenants."  *Id.* ¶ 64.  But they allege no contemporaneous facts demonstrating that this statement was false when made, relying exclusively instead on after-the-fact developments—such as Spirit's later alleged breach of liquidity covenants and failure ultimately to deliver to GAT all of the aircraft required by the ASA.  *Id.*  Plaintiffs' allegations about these subsequent events are textbook fraud by hindsight, which is not actionable.  *See, e.g.*, *In re Greenlane Holdings, Inc. Sec. Litig.*, 511 F. Supp. 3d 1283, 1311–12 (S.D. Fla. 2021) (rejecting falsity allegations based on "after-the-fact conduct," including that defendants had "downplayed" potential negative impact on their business that later came to pass); *In re Winn-Dixie Stores, Inc. Sec. Litig.*, 531 F. Supp. 2d 1334, 1350 (M.D. Fla. 2007) ("transparent attempt to plead fraud-by-hindsight" failed where complaint confirmed that later statements "were based on changed circumstances and new information").

9

Beyond that, the allegations do not even contradict Mr. Christie's statement.  Plaintiffs ignore that the very same press release on which they rely announced that Spirit had completed a substantial debt reduction and capital infusion, *see* Ex. 3 (Mar. 12, 2021 Press Release)—which Plaintiffs do not dispute and which explains precisely how Spirit was in a "stronger financial position," thereby supporting Mr. Christie's nonactionable statement.  *See Cambridge Ret. Sys. v. MEDNAX, Inc.*, 2019 WL 4893029, at *20 (S.D. Fla. Oct. 3, 2019) (other factual allegations about company's revenue growth and closed deals "belied" assertion that defendants' "positive statements about [company's] projected growth" and deal pipeline were false).  Moreover, the press release expressly disclosed the risks that allegedly falsified the challenged statement.  It specifically directed investors to the risk factors in Spirit's previously filed FY 2024 10-K describing its precarious liquidity position (*supra* at 4), and independently warned that the statements in the press release were subject to multiple risks, including "the Company's ability to refinance, extend or repay its near and intermediate term debt" and its "substantial level of indebtedness," Ex. 3 (Mar. 12, 2021 Press Release) at 2.

*Second*, Plaintiffs challenge as "outright false" under ASC 205-40—i.e., accounting guidance requiring an assessment of a company's ability to continue as a going concern—the statement in Spirit's Q1 2025 10-Q that it was "probable" that Spirit would have sufficient liquidity to meet future cash needs and operate as a going concern.  AC ¶¶ 70–71.  But Plaintiffs' "conclusory assertion . . . never explains precisely *how* [Spirit's] disclosures ran afoul of" the accounting guidance, and even if it had, "an accounting violation doesn't necessarily give rise to Rule 10b-5 liability."  *Carvelli*, 934 F.3d at 1332; *see also Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208–10 (11th Cir. 2001) (identifying information that allegedly "should have revealed the need for going concern qualifications in [] audit opinions" insufficient to satisfy Rule 9(b))

10

(collecting cases); *In re Eagle Bldg. Techs., Inc., Sec. Litig.*, 319 F. Supp. 2d 1318, 1331 (S.D. Fla. 2004) (same).  For these reasons alone, the "going concern" statement is not actionable.

Plaintiffs' only attempts to explain the alleged falsity of this statement again is based solely on hindsight pleading.  Plaintiffs contend that the challenged statement is inconsistent with their allegation that Spirit's liquidity had already fallen below the $850 million threshold in the Elavon Agreement, AC ¶ 71, but Plaintiffs themselves concede that this had *not* yet occurred as of March 30, 2025—the conclusion of the relevant reporting period covered by the Q1 10-Q.  *Id.* (acknowledging that "total liquidity may then have been modestly above the $850 million threshold in the Elavon agreement"); *id.* ¶ 53 (chart showing that Spirit had $882 million in available liquidity); *id.* ¶¶ 73, 83 (same); *see also* Ex. 8 (Exam. R.) at 28, 37 (discussing drop in liquidity during Q2).

Nor do Plaintiffs offer any particularized, contemporaneous allegations to show otherwise as of May 30, 2025—the Q1 10-Q's filing date.  The Examiner's Report, on which Plaintiffs heavily rely, determined that substantive discussions between Spirit and Elavon regarding a potential breach of the Elavon Agreement did not even *begin* until March 2025, and even then, Elavon did not contend that Spirit had failed to meet the agreement's minimum liquidity covenant.  Ex. 8 (Exam. R.) at 123.  It was only "*[a]fter* the publication of the 10-Q for Q2 2025" on August 11, 2025—months *after* the challenged statement in the Q1 10-Q—that Elavon first took the position that Spirit had breached the agreement's liquidity covenant, and it did so then only because the Q2 2025 10-Q "essentially contained a going concern qualification." *Id.* at 123.  And when Elavon subsequently "conditioned a[n] extension of [the Elavon Agreement] on significant and immediate collateralization," *id.*, Spirit promptly disclosed that information just days later on August 21, 2025—as Plaintiffs *themselves* allege, AC ¶ 18; Ex. 7 (Aug. 21, 2025 8-K) at 2.  Thus,

11

the challenged "going concern" statement was, in fact, true and nonactionable both as of the end of Q1 2025 and as of the date the Q1 10-Q was filed.[2]

*Third*, Plaintiffs allege that certain risk factors in the Q1 2025 10-Q were false because they presented certain risks as "hypothetical" when the Company was already facing a looming liquidity crisis.  AC ¶¶ 76–77.  But the challenged risk factors themselves expressly disclosed just that:  they warned investors that Spirit "will need additional funds to finance our operations and our debt obligations," that, although the Company already had taken steps to improve its liquidity position, there were "no assurances" that it could raise sufficient funds to meet its obligation, and that failure to do so would have a material adverse effect on the Company's financial position.  *Id.* ¶ 76.  None of the reasons Plaintiffs advance for why these statements were false, *id.* ¶ 77, reflect anything other than alleged factors contributing to the precarious liquidity position that Spirit amply disclosed.  *See Carvelli*, 934 F.3d at 1322 (rejecting falsity arguments based on the "context of the complained-of statements").  Moreover, as set forth above, *supra* at 10-11, any suggestion that the risk factors were false because Spirit had already breached its Elavon liquidity covenants directly contradicts other allegations in the AC and the Examiner's Report integral to it.

### B.  Plaintiffs Fail to Plead Any Actionable Omission

Plaintiffs are thus left solely to contend that Defendants should have disclosed additional information about various aspects of Spirit's business.  But "[p]ure omissions are not actionable under Rule 10b-5(b)."  *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 259–60 (2024); *see also Carvelli*, 934 F.3d at 1317 ("[A]bsent a duty, material information needn't be disclosed unless its omission would render misleading other information that an

---

[2] For the same reasons, Plaintiffs do not support their conclusory assertion that the Q2 2025 10-Q was "outright false" or misleading when it reported that Spirit remained in compliance with the liquidity and other covenants in the Elavon Agreement.  AC ¶ 83.  As set forth above, the AC contains no well-pleaded factual allegations to suggest a breach of the liquidity covenant prior to August 11, 2025, and no allegations at all as to other covenants.

issuer *has* disclosed."); 17 C.F.R. § 240.10b-5(b) (requiring disclosure only when necessary "to make the statements made, in the light of the circumstances under which they were made, not misleading").  Thus, Plaintiffs cannot sustain their omissions theory in the absence of alleged affirmative statements that were rendered misleading by the supposedly omitted information.  The AC contains no such allegations.

Much like Plaintiffs' falsity theory, their omission claim is generally premised on allegations that Spirit failed to disclose its liquidity challenges—including its cash-burn rate and alleged breaches of liquidity covenants in its lending agreements and the Elavon Agreement.  AC ¶¶ 18, 60–61, 64, 71, 73, 77, 79, 83–84, 86.  The AC also alleges that Defendants failed to disclose the specific terms of GAT's inspection rights under the ASA, details of the Company's ongoing progress in delivering the aircraft thereunder, and the alleged impossibility of arranging sufficient aircraft engine inspections to comply with the ASA's delivery schedule.  *Id.* ¶¶ 64, 68, 71, 75, 77, 79, 86.  But, as set forth above, ***all of this information was disclosed***.  *Supra* at 4–7.  None of these allegations—when taken, as they must be, in the full context of the copious information that Spirit disclosed during the Class Period—supports a plausible inference that Defendants' challenged statements were materially misleading by omission.

 1. *Plaintiffs Fail to Plead Any Actionable Omission Based on Spirit's Alleged Liquidity Challenges and Liquidity Covenants*

The AC alleges that omitting Spirit's liquidity challenges rendered certain statements in its March 12, 2025 press release, AC ¶ 64, and Q1 2025 10-Q, *id.* ¶¶ 71, 73, 77, 79, misleading.  This is demonstrably not so.

***March 12, 2025 Press Release.***  Plaintiffs allege that it was misleading for Mr. Christie to state that the Company exited Spirit 1 in a "stronger financial position" without also "discussing known risks including liquidity covenants" and disclosing that "Spirit was faced with an imminent

default of its debt and credit card processing agreements and thus did not then have a path to keep itself afloat let alone to return to profitability." AC ¶ 64. But his statement "would be misleading only if it conveyed to the public a false impression" of Spirit's liquidity position and the status of the Elavon Agreement coming out of the first bankruptcy. *See FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1306 (11th Cir. 2011). In fact, the challenged statement does not mention liquidity or the Elavon Agreement *at all*. Rather, it focused solely on describing debt-to-equity conversion and equity infusion transactions, as well as the Company's product offerings—the accuracy of which are not contested in the AC. *Supra* at 9–10. The challenged statement thus does not convey *any* impression to the public about Spirit's liquidity position or the Elavon Agreement and therefore cannot be misleading. *FindWhat Inv. Grp.*, 658 F.3d at 1306 (10b-5 omission claim failed because "accurate[] report of company-wide revenue growth" did not "impl[y] that all was well within every component of the company" and did not mention and "conveyed no message regarding the underlying quality of" click traffic); *see also Mulvaney v. GEO Grp., Inc.*, 237 F.Supp.3d 1308, 1319 (S.D. Fla. 2017) (similar). Furthermore, Spirit had already disclosed its liquidity challenges and warned of their potential impact on the Elavon Agreement in its 2024 10-K that was filed on March 3, 2025, and the press release specifically pointed investors to those risk disclosures, *supra* at 4–5, 10; the alleged failure to repeat that information in the press release in greater detail did not "render[] [the] already-disclosed information misleading in context." *Carvelli*, 934 F.3d at 1318.

*Q1 2025 10-Q.* Plaintiffs first allege that it was misleading to disclose that Spirit's management had "concluded"—after assessing liquidity needs "over the next 12 months"—that "it is probable we will have sufficient liquidity to meet our future cash needs[.]" AC ¶ 70. According to the AC, this statement was misleading because Spirit did not disclose that "the Company's available cash was already below the liquidity covenant in the Elavon agreement," or,

14

if it was not, that "the Company was burning cash at a rate that gave them no reasonable basis to believe that [it] could avoid breaching the threshold in the coming twelve months"; that the Company was likely to breach its liquidity covenants with its lenders, especially if Elavon exercised its holdback rights under the Elavon Agreement; and that the Company "had not then obtained any renegotiation of the liquidity threshold with Elavon and had no reasonable basis to believe it could" do so.  *Id.* ¶ 71.  But even setting aside that the challenged statement is a nonactionable statement of opinion, *infra* at 20-21, none of Plaintiffs' allegations render the statement misleading given Spirit's robust disclosures.  *See Carvelli*, 934 F.3d at 1318.

To start, Plaintiffs concede that the Q1 2025 10-Q explicitly disclosed in a risk factor that "we anticipate that we will need additional funds to finance our operations and our debt obligation" and that failure to do so could materially affect the Company's business.  AC ¶ 76; Ex. 5 (Q1 2025 10-Q) at 57–58.  Far from "downplay[ing] liquidity concerns as a mere hypothetical,"  AC ¶¶ 76–77, this disclosure made clear that present liquidity did *not* suffice and that Spirit would have to generate additional liquidity through the improvement plans that management already "ha[d] implement[ed] and continue[d] to implement," as to which there were "no assurances" of success or sufficiency.  *Id.* ¶ 76.  Plaintiffs fail to confront these disclosures.  They likewise disregard their own allegation that the challenged statement was expressly conditioned on "the renegotiation of terms with [Elavon]."  *Id.* ¶ 70.  Thus, the Company expressly told investors that, without such negotiations, Spirit would *not* have sufficient liquidity to meet its needs over the coming year.  *See In re Galectin Therapeutics Sec. Litig.*, 843 F.3d 1257 (11th Cir. 2016) (omissions actionable only where "the absence of those facts would, under the circumstances, render another reported statement misleading to the reasonable investor").

Plaintiffs' conclusory allegation that there was "no reasonable basis" to believe a renegotiation was possible, *id.* ¶ 71, similarly does not render the challenged statement misleading

15

in context.  Plaintiffs do not allege any facts—particularized or otherwise—to suggest that Defendants had some reason at the time to believe that Spirit could not successfully renegotiate the Elavon Agreement—a risk Spirit explicitly warned of in any event.  Notably, Plaintiffs conveniently omit the very next sentence in the Q1 2025 10-Q, which further warned that "[m]anagement can give no assurances that its current plans" to renegotiate the Elavon Agreement "will be successful."  Ex. 5 (Q1 2025 10-Q) at 48.  Nor do Plaintiffs take into account, as they must, the Company's warning that "[i]nadequate liquidity may materially adversely affect . . . our ability . . . to enter into or amend critical contractual relations with third parties due to concerns about our ability to meet our contractual obligations," *id.* at 58; *see also id.* at 59—precisely the information the AC counterfactually contends was *not* disclosed.

Plaintiffs try to allege that it was misleading to disclose that Elavon does not "require the Company to maintain cash collateral, *provided that* the Company satisfies certain liquidity and other financial covenants" without also disclosing the full terms of the Elavon Agreement and Spirit's liquidity position.  AC ¶ 57 (quoting Ex. 5 (Q1 2025 10-Q) at 27); AC ¶¶ 72 –73.  But this contention, too, falls short.  The challenged statement itself told investors that, if Spirit did *not* meet liquidity thresholds, Elavon could require cash collateral.  And if there were any doubt, the 10-Q went on to state (in the very next sentence conveniently omitted from the AC) that "failure to meet these covenants would provide the [credit card] processors the right to put in place a holdback resulting in a commensurate reduction of unrestricted cash."  Ex. 5 (Q1 2025 10-Q) at 27; *see also id.* at 58 (similar).[3]

---

[3] There also is no allegation in the AC that Elavon ever called a default under the Elavon Agreement.  All Plaintiffs assert is that Spirit's liquidity level dropped below the threshold in the Elavon Agreement that gave Elavon the right to exercise its holdback option, AC ¶¶ 71, 73, 83, but Spirit had no duty to disclose such information in a vacuum.  Indeed, once Elavon requested additional collateral from Spirit in August 2025, Spirit promptly disclosed these developments.  AC ¶ 18; *see also* Ex. 7 (Aug. 21, 2025 8-K) at 2.

16

Similarly insufficient are Plaintiffs' contentions that the challenged statements were misleading based on Spirit's alleged failure to disclose "a looming liquidity crisis with its lenders" . . . especially once it defaulted on the Elavon agreement."  AC ¶¶ 64, 71, 77, 79, 86.  As discussed, Spirit disclosed its "substantial indebtedness" and the existence of restrictive covenants contained in its Exit Revolving Credit Facility, *see, e.g.*, Ex. 5 (Q1 2025 10-Q) at 58, the agreement for which—including the terms of its liquidity covenant—was appended in full to the Q1 2025 10-Q as an exhibit.  *Id.* at 64; Ex. 5 (Q1 2025 10-Q) at Ex. 10.1 § 6.08.  Plaintiffs' allegations that Spirit would be unable to meet the debt liquidity covenants once it defaulted on the Elavon Agreement amounts to the same theory that Spirit failed to disclose the "imminent" breach of that Agreement, which fails for the reasons already discussed.  That theory fails for the additional reason that Plaintiffs do not allege with particularity that the disclosures about the Company's ability to meet its liquidity covenants—either in the lending agreements or the Elavon Agreement—contradicted information available to Defendants at the time.  *See supra* at 11-12; *infra* at 23.  That Plaintiffs would have evaluated the circumstances differently to reach different conclusions than management did—albeit with the benefit of 20/20 hindsight and the Examiner's Report—is insufficient to state a claim.  *See, e.g.*, *Underwood v. Lampert*, 2004 WL 7332754, at *13 (S.D. Fla. Aug. 30, 2004) ("A poor business judgment, without more, does not establish scienter."); *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1324 (S.D. Fla. 2004) ("Plaintiffs allegations may rise to the level of poor business judgment or even mismanagement, but do not to the level of fraud."); *Winn-Dixie*, 531 F. Supp. 2d at 1348.

*Q1 & Q2 2025 10-Q Certifications*.  For the reasons set forth above, Plaintiffs cannot plead that Messrs. Davis's and Cromer's certifications of the Q1 and Q2 2025 10-Qs were actionably misleading.  AC ¶¶ 78–79, 85–86; *see, e.g.*, *In re Equifax Inc. Sec. Litig.*, 357 F.Supp.3d 1189,

17

1231 (N.D. Ga. 2019) (where "Plaintiff has not alleged that [company's] financial reports were inaccurate in any way, its claims concerning [defendants'] certification . . . fail").

      2.    *Plaintiffs Fail to Plead Any Actionable Omission Based on the ASA*

Plaintiffs' claims based on the alleged failure to disclosure information about aircraft sales under the ASA also fail. As an initial matter, virtually none of the challenged statements even mentions the ASA—let alone discusses the status of the plane sales it contemplated, GAT's inspection rights, or Spirit's ability to book aircraft repair slots. Instead, the statements supposedly rendered misleading by omission of this information are the same statements about Spirit's liquidity position and "progress" in driving fleet changes that Plaintiffs challenge as false and misleading for other supposed reasons. *See, e.g.*, AC ¶¶ 10–11, 63–64, 67–68, 70–71, 76–79. Because these challenged statements say nothing about the ASA and convey no message about the status of the plane sales it governed, they could not have misled investors about that topic. *See Carvelli*, 934 F.3d at 1317 ("[M]aterial information needn't be disclosed unless its omission would render misleading other information that an issuer *has* disclosed.") (emphasis in original).

The single challenged statement that at least mentions the ASA merely adjusted Spirit's estimated loss (gain) on disposal of the aircraft due to increased costs under the ASA, AC ¶ 74, without any further discussion that could have falsely conveyed anything about whether the sales were on schedule, let alone about the status of aircraft inspections. Plaintiffs do not allege that the recording of the adjustment was inaccurate in any way, and they do not otherwise explain how or why a reasonable investor would have been misled by that update. *Galectin*, 843 F.3d at 1274–75 (accurate reporting of financial figures did not create a duty to disclose more on a related topic).[4]

---

[4] But, even if this accounting adjustment somehow triggered a disclosure about the status of the plane sales (which it did not), the Examiner determined that management believed that "some portion of the $150 million in incremental liquidity [from the plane sales] could [still] be realized by August 2025." (Ex. 8 at 115–16.) The AC does not contain particularized facts supporting a contrary inference, and Plaintiffs' hindsight conjecture based on the ASA's subsequent
(….continued)

With almost no challenged statements that even mention the ASA, Plaintiffs essentially allege—based entirely on the Examiner's after-the-fact report—that, because reducing Spirit's fleet, including through sales under the ASA, was an assumption underlying the projections for the Spirit 1 bankruptcy plan, Defendants were required to have disclosed the full terms of the ASA and thereafter to have kept investors updated on its day-to-day execution to avoid rendering misleading more general statements about Spirit's liquidity and ability to operate as a going concern.  AC ¶¶ 10-11, 44, 46-47, 50.  But adequate disclosure under the securities laws is not a rite of confession, particularly when there is no affirmative duty to disclose.  *Galectin*, 843 F.3d at 1274-75.  Plaintiffs identify no duty to disclose the ASA's commercially sensitive terms related to the inspection specifications, to detail any difficulties Spirit may have been facing in meeting the contractual delivery schedule, or to otherwise update the market on projections provided *to the Bankruptcy Court* that were not reiterated after emergence from the Spirit 1 proceeding.  *Winn-Dixie*, 531 F. Supp. 2d at 1348 (defendants "had no duty to discuss the bumps along the road" or "challenges posed" to implementing strategy or to describe the merger as imperiled or in danger).  Nor do the securities laws require that a company disclose all known facts about an agreement whenever it is referenced in its disclosures.  *Galectin*, 843 F.3d at 1274–75 (securities laws do not create an affirmative duty to disclose any and all material information that exists—just what is necessary to prevent statements from being so incomplete as to mislead).  Moreover, no reasonable investor would have relied on assumptions underlying Spirit's bankruptcy projections to assess Spirit's liquidity after it emerged in the first place given that Spirit explicitly warned investors not to do so.  Ex. 5 (Q1 2025 10-Q) at 58–59 (projections "prepared solely for the purpose of [Spirit

---

"terminat[ion] on July 15 2025 (AC ¶ 50)—a month and a half later—is insufficient to state a claim.  *See City of Hollywood Police Officers' Ret. Sys. v. Citrix Sys., Inc*., 649 F. Supp. 3d 1256, 1273, 1276 (S.D. Fla. 2023) ("That Defendants revised. . . [their] previously reported financial figures, even to a great extent, provides no indication how or when Defendants became aware of the falsity of the original statements.").

19

1]," were not updated, "reflected numerous assumptions . . . that may not materialize," may "prove to be wrong in material respects," and "investors should not rely on these projections").

Finally, Plaintiffs do not explain how an FAA investigation into certain IAE engines *five years* before the Class Period or proposed additional maintenance requirements for certain engine models in November 2024, AC ¶ 47 & nn.10–11, rendered Defendants' recording of loss (gain) related to the ASA in May 2025 misleading when made.  Notably, Plaintiffs concede that the Examiner's Report "did not indicate that the aircraft to be sold in the [ASA] themselves contained defective powdered metal coatings," *id.* ¶¶ 49–50, and Spirit disclosed both the P&W engine issue and the difficulty in booking repair slots before the Class Period even began, *supra* at 5–7.

### C.  Certain Statements Are Nonactionable Corporate Puffery or Opinion

Both statements made in the March 12 and May 27 press releases, AC ¶¶ 63, 67, are non-actionable puffery because they are too vague and generalized for a reasonable investor to have relied upon them and because they are statements of opinion.  The "probable" statement in Spirit's Q1 2025 10-Q, *id.* ¶ 70, also is a nonactionable statement of opinion.

Statements are nonactionable puffery if they convey "generalized, vague, [or] nonquantifiable" corporate optimism because such statements are "too boosterish to justify reasonable reliance."  *Carvelli*, 934 F.3d at 1318.  "Quintessential" examples include statements touting that a company has devoted "substantial resources" to problems, has "improved results," or is taking a "leading role" and making "progress."  *Id.* at 1321.  Mr. Christie's statement that Spirit was in a "stronger financial position" after Spirit 1, AC ¶ 63; *see also* Ex. 3 (Mar. 12, 2025 Press Release), and Mr. Davis's statement that he was "pleased" with Spirit's "progress," *id.* ¶ 67; *see also* Ex. 4 (May 27, 2025 Press Release), are precisely the types of puffery statements that courts routinely reject as nonactionable.  *See Carvelli*, 934 F.3d at 1320–21 (collecting Circuit cases); *see also, e.g.*, *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *12

20

(S.D. Fla. Apr. 19, 2013) (statements that company had "healthy demands," intended to "compete successfully," and had "encouraging" prospect of early bookings nonactionable puffery); *Cutsforth v. Renschler*, 235 F. Supp. 2d 1216, 1239, 1251 (M.D. Fla. 2002) (statements that acquisition "continues dynamic growth," "adds enhanced value," and drives "strong, top-line growth" while improving operating margins and "achieving our strategic objectives" nonactionable puffery).  Tellingly, Plaintiffs elide the rest of Mr. Davis's statement, which acknowledged that there was still "lots to do"—language that "cuts [their] argument out from under [them]" and confirms that "no reasonable investor would have considered" Mr. Davis's statement "in making investment decisions."  *See Carvelli*, 934 F.3d at 1322 (same, where company announced that it "continue[d] to make progress in resolving our legacy issues" while acknowledging that "there is more work to be done").

These statements also are nonactionable statements of opinion, as is the statement in Spirit's Q1 2025 10-Q disclosure that management believed it was "probable" that Spirit would have sufficient liquidity to meet its future cash needs.  The AC fails to allege that Mr. Christie or Mr. Davis subjectively disbelieved his respective press release statement or that the statements contained false, "embedded statements of fact."  *Omnicare, Inc. v Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015); *Carvelli*, 934 F.3d at 1322.  The AC contains no allegations about Mr. Christie's or Mr. Davis's state of mind.  *See infra* at 24-25.  Nor does it allege that any facts in Mr. Christie's statement are false, *supra* at 9-10, while Mr. Davis's statement is not alleged to contain *any* facts at all, *compare Omnicare, Inc.,* 575 U.S. at 186 (statement nonactionable if it is "pure statement[] of opinion") *with* AC ¶ 67.  The AC also fails to allege that either Messrs. Davis or Cromer did not believe management's assessment of cash and cash equivalents, cash flow, and management's current plans, nor does it allege that this belief

was contradicted by information available to them at the time. *See infra* at 23-24. As a matter of law, such statements of opinion are not actionable. *Carvelli*, 934 F.3d 1322–23.

## II. Plaintiffs Fail to Plead a Strong Inference of Scienter

Separately, the AC must be dismissed because it fails to plead with particularity facts giving rise to a "strong inference" of scienter, i.e., that each Defendant either intended to defraud investors or was "severely reckless" when making each of the challenged statements attributed to him. *See Mizzaro*, 544 F.3d at 1238. An inference of scienter is "strong" if it is "cogent and at least as compelling as any opposing inference." *Id.* (citation omitted). The AC falls well short.

As an initial matter, Plaintiffs' scienter allegations fail for the same reason as their falsity allegations: they rely almost entirely on "the classic fraud by hindsight theory where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly." *Citrix Sys.,* 649 F. Supp. 3d at 1273. Plaintiffs criticize Spirit's management for failing to predict the rate at which Spirit's liquidity and cash position would deteriorate during the summer of 2025 and then commenting on those developments after the fact. *See, e.g.*, AC ¶ 95 (alleging that Mr. Davis commented in an internal memo on the "going concern" warning in Spirit's Q2 2025 10-Q days *after* it was filed); *id.* ¶ 97 (alleging that Mr. Cromer commented on the "failed" ASA in Spirit 2 bankruptcy filings a month *after* the ASA's termination). Such fraud-by-hindsight allegations do nothing to show that Defendants acted with knowledge or recklessness *when they made* the challenged statements. S*ee Kadel v. Flood*, 427 F. App'x 778, 780 (11th Cir. 2011) (no scienter as to statements that "expressed mistaken confidence in [company]'s financial well-being"; "stronger inference [was] that appellees simply failed to predict the eventual collapse of the housing and subprime mortgage market"); *Winn-Dixie*, 531 F. Supp. 2d at 1350 (later bankruptcy filing did not support scienter as to earlier statements about strategic changes where bankruptcy "based on changed circumstances and new information").

22

Beyond impermissible hindsight pleading, the AC's hodgepodge of "additional allegations of scienter" cannot sustain Plaintiffs' burden. *See id.* ¶¶ 94-101. Indeed, the AC's scienter allegations are most notable for what they lack: there are no allegations that any Defendant had personal motive to commit fraud, "there are no claimed e-mails or letters from any of the individual defendants expressly" discussing the alleged misstatements or omissions *prior to* or *contemporaneous with* the making of those statements, and the AC does not cite a single confidential witness—let alone any who "say that any one of the individual defendants ever discussed the alleged fraud or even knew about it." *Mizzaro*, 544 F.3d at 1247–48.

The AC simply does not contain—as it must—particularized allegations "supporting a strong inference of scienter for each defendant with respect to each violation." *Mizzaro*, 544 F.3d at 1238. Critically, the AC does not include *any* specific scienter allegations as to Mr. Christie. AC ¶¶ 94–103. As to Messrs. Davis and Cromer, it asserts they had "actual knowledge of the underlying facts" based on their knowledge of and personal involvement in Spirit's optimization strategy and/or day-to-day affairs, *id.* ¶¶ 94, 96–97, 100, because they spoke to investors or the bankruptcy court about the Company's financial condition, *id.* ¶¶ 94–99, and because the alleged fraud related to Spirit's "core operations," *id.* ¶ 102. But such generalized allegations are indisputably insufficient as a matter of law. For example, Mr. Davis's alleged role in heading up a "review of the network optimization strategy," AC ¶ 94, has nothing to do with the alleged misstatements attributed to him, while Mr. Cromer's alleged knowledge of the Company's "financial reporting," *id.* ¶ 96—in his role as CFO—would be equally true of any public company CFO. *See Brophy v. Jingbao Pharms., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015) (rejecting that scienter could be inferred "solely on [defendant's] position as CFO"). Thus, if Plaintiffs' generic allegations were adequate, "every corporate executive who participates in the day-to-day management of his company would be exposed to liability for securities fraud." *In re Criimi Mae,*

23

*Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 662 (D. Md. 2000) (rejecting scienter allegations based on core operations doctrine and executives' day-to-day activities); *see also Kosowsky v. Icahn Enters. L.P.*, 748 F. Supp. 3d 1303, 1322–23 (S.D. Fla. 2024) (similar).[5]

Plaintiffs' remaining attempts at scienter fare no better.  As noted above with respect to Mr. Christie, Plaintiffs plead no facts that support an inference of scienter; only that he made certain of the challenged statements.  AC ¶¶ 98–99, 100.  To the extent that Plaintiffs attempt to plead that the "scope, duration and amount of the alleged fraud" means that Mr. Christie must have known about it, that too is insufficient.  *Mizzaro*, 544 F.3d at 1254.  Plaintiffs similarly fail in their attempt to suggest that Messrs. Davis and Cromer acted with scienter because Mr. Davis purportedly "spoke with authority" about Spirit's bankruptcy risks on August 13, 2025, two weeks before the Spirit 2 bankruptcy, *see* AC ¶ 95, and because the Company made advance payments to its bankruptcy counsel in June, July and August 2025 to maintain its retainer and retained an investment banking advisor by July 2025, *id* ¶ 103.  Even if this conduct reflects awareness of a bankruptcy risk, the "[m]ere proximity in time between optimistic or reassuring statements about a company's prospects and filing for bankruptcy protection does not give rise to a strong inference of scienter when, as here, the event[s] that forced the company to seek bankruptcy protection did not occur until after the statements were made." *Criimi Mae*, 94 F. Supp. 2d at 662.  As discussed, *supra* at 11, that is exactly what happened here.[6]

―――――――――――――――――

[5] Insofar as the AC attempts to allege scienter based on Messrs. Davis and Cromer signing 10-Q reports and certifications, AC ¶¶ 29–30, 69, 78, 80, 85, 129, those allegations also fail.  *See, e.g.*, *Durham v. Whitney Info. Network, Inc.*, 2009 WL 3783375, at *18 (M.D. Fla. Nov. 10, 2009) ("The mere fact that certain defendants signed SEC filings is not indicative of scienter and certainly does not create a more compelling inference than the inference that defendants' signatures were routine."); *see also Verzwyvelt v. Terran Orbital Corp.*, 2025 WL 2425081, at *13 (S.D. Fla. Aug. 22, 2025) (alleged filing of "SOX certifications is also not probative").

[6] Independently, Plaintiffs' "failure-to-disclose-bankruptcy-planning claim has been considered and rejected" as sufficient to plead scienter due to "public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future, free from any
(….continued)

24

Finally, Plaintiffs' allegations regarding Spirit's decision not to publish the full terms of the Elavon Agreement and to redact certain terms in the publicly filed ASA do not support *any* inference of scienter—much less a "strong" one.  AC ¶¶ 57, 104.  Plaintiffs do not allege which of the Defendants made these determinations or why they purportedly did so.  Nor does the AC explain how or why Spirit's decision to keep confidential commercially sensitive aspects of its commercial agreements with third parties would support an inference of fraud, as opposed to the far more "cogent" inference that Defendants simply exercised sound business judgment to protect the Company's legitimate business interests.  *See, e.g.*, Ex. 1 (Spirit 1 Cromer Decl.) at 6–7 (explaining that "the [ASA] and the exhibits thereto [] contain sensitive commercial information, disclosure of which "would likely harm Spirit and jeopardize its goals … in various ways").  Because the AC "conspicuously omits any facts that would require one to rule out an innocent explanation for the alleged behavior," it fails to plead scienter.  *Kadel*, 427 F. App'x at 780–81.

## III.   Plaintiffs Fail to Plead "Controlling Person Liability"

Because Plaintiffs do not adequately allege any primary violation of the Exchange Act, their Section 20(a) "controlling person" claims necessarily fail.  *Mizzaro*, 544 F.3d at 1236–37.

## <u>CONCLUSION</u>

Defendants respectfully request that the Court dismiss the AC with prejudice.

---

obligation to disclose potential bankruptcy."  *Edwards v. McDermott Int'l, Inc.*, 2022 WL 3927828, at *6 (S.D. Tex. Aug. 30, 2022).  If companies had to disclose their deliberations about declaring bankruptcy to avoid securities liability, it would undoubtedly become "a self-fulfilling prophecy."  *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009), *aff'd*, 419 F. App'x 38 (2d Cir. 2011).

Dated: April 22, 2026

Respectfully Submitted,

HILGERS PLLC

*/s/ Carly A. Kligler*
Carly A. Kligler
Alec H. Schultz
3801 PGA Boulevard, Suite 600
Palm Beach Gardens, FL 33410
Telephone: (561) 485-1325
ckligler@hilgerslaw.com
aschultz@hilgerslaw.com


Dana M. Seshens*
Daniel J. Schwartz*
Esther C. Townes*
*Admitted pro hac vice*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
dana.seshens@davispolk.com
daniel.schwartz@davispolk.com
esther.townes@davispolk.com

*Counsel for Defendants*

26

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on April 22, 2026, I electronically filed the foregoing document, **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**, with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on this day on counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Carly A. Kligler*

Carly A. Kligler
**HILGERS PLLC**
3801 PGA Boulevard, Suite 600
Palm Beach Gardens, FL 33410
Telephone: (561) 485-1325
ckligler@hilgerslaw.com