UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-61959-CIV-DIMITROULEAS

TERRANCE MLECZKO and TM DEFENSE
SOLUTIONS LLC, Individually and on Behalf of All
Others Similarly Situated,

      Plaintiffs,

v.

DAVID DAVIS, FREDERICK S. CROMER, EDWARD
M. CHRISTIE III,

      Defendants.

_____/

## <u>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS</u>

This cause is before the Court on David Davis, Frederick S. Cromer, Edward M. Christie III

("Defendants" or "Spirit")'s Motion to Dismiss the Amended Complaint and Incorporated

Memorandum of Law (the "Motion") [DE 53] filed herein on April 22, 2026. The Court has

carefully considered the Motion [DE 53], the Response in Opposition [DE 57], filed June 5, 2026,

and the Reply in Support [DE 62] filed herein July 13, 2026.

This cause is also before the Court on Defendants' Request for Consideration of Documents

and Judicial Notice in Support of Defendants' Motion to Dismiss the Amended Complaint (the

"Request") [DE 54], filed herein on April 22, 2026. The Court has carefully considered the

Request, the Opposition [DE 58], filed June 5, 2026, and the Reply in Support [DE 62], filed July

13, 2026.

The Court is otherwise fully advised in the premises. Upon careful consideration of the

briefing and the record, the Request [DE 54] is **GRANTED**; the Motion [DE 53] is **GRANTED.**

1

Plaintiffs Terrance Mleczko and TM Defense Solutions LLC (collectively, "Plaintiffs"), through their Amended Complaint, bring this securities fraud action on behalf of investors who purchased Spirit Aviation Holdings, Inc. common stock between March 12, 2025 and August 29, 2025. The Amended Complaint alleges that Spirit's former CEO Edward Christie, current CEO David Davis, and CFO Frederick Cromer violated Section 10(b), 20(a), and Rule 10b-5 of the Securities Exchange Act by making a series of materially false and misleading statements concerning Spirit's financial condition following its emergence from Chapter 11 bankruptcy in March 2025.

This action commenced on September 30, 2025. Plaintiffs filed their Amended Complaint ("AC") [DE 42], the operative pleading, with leave of Court on March 2, 2026.

## I.   **ATTACHMENTS**

Before addressing the merits of the Defendants' Motion, the Court will decide whether to consider Defendants' attachments to their motion to dismiss. Ultimately, these exhibits are appropriate for consideration at this stage.

Defendants attach eight documents to their motion to dismiss and request the Court consider these documents in evaluating their motion. Defendants argue the attachments are "incorporated by reference in the Amended Complaint and/or are public documents of which the Court may take judicial notice." [DE 54]. Defendants request the Court to consider:

| Ex. | Document Description[1] |
|---|---|
| 1 | Declaration of Fred Cromer in Support of (i) Motion of the Debtor for Entry of Interim and Final Orders Authorizing the Debtor to Assume and Perform Under Aircraft Sale Agreement with G.A. Telesis LLC (Including, Without Limitation, Selling Aircraft Free and Clear of Encumbrances) and (ii) Motion of the Debtor for Entry of an Order Authorizing the Filing of Certain Commercially Sensitive Information Under Seal), filed in *In re Spirit Airlines, LLC, et al.*, No. 24-11988-SHL (Bankr. S.D.N.Y. Nov. 25, 2024) (ECF No. 97) |
| 2 | Excerpts from Spirit Airlines, Inc. Form 10-K for the fiscal year ended December 31, 2024, filed with the SEC on March 3, 2025 ("FY 2024 10-K") (full version accessible at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001498710/000149871025000008/save-20241231.htm#i6beb3a98ed13485388db768b3a4ef4bf_229) |
| 3 | Press release issued on March 12, 2025 by Spirit Aviation Holdings, Inc., titled "Spirit Airlines Emerges from Financial Restructuring, Better Positioned to Advance its Transformation and Enhance Guest Experience" |
| 4 | Spirit Aviation Holdings, Inc. Form 8-K filed with the SEC on May 27, 2025, with press release issued on same day by Spirit Aviation Holdings, Inc., titled "Spirit Aviation Holdings, Inc. Announces Receipt of NYSE American Delinquency Notification" attached thereto as Exhibit 99.1 |
| 5 | Excerpts from the Spirit Aviation Holdings, Inc. Form 10-Q for the quarter ended March 31, 2025, filed with the SEC on May 30, 2025 (full version accessible at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001498710/000149871025000030/save-20250331.htm) |
| 6 | Excerpts from the Spirit Aviation Holdings, Inc. Form 10-Q for the quarter ended June 30, 2025, filed with the SEC on August 11, 2025 (full version accessible at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001498710/000149871025000037/save-20250630.htm) |
| 7 | Spirit Aviation Holdings, Inc. Form 8-K filed with the SEC on August 21, 2025 |
| 8 | Report of Examiner Marc J. Heimowitz, filed in *In re: Spirit Aviation Holdings, Inc., et al.*, No. 25-11897-SHL (Bankr. S.D.N.Y. Dec.15, 2025) (ECF No. 595) |

When deciding a motion to dismiss a district court generally only considers the four corners of the complaint and the exhibits attached to the complaint. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). However, "[u]nder the incorporation-by-reference doctrine, a district court may consider evidence attached to a motion to dismiss without converting the motion into a motion for summary judgment 'if the document is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged.'" *Swinford v. Santos*, 121 F.4th 179, 187 (11th Cir. 2024) (quoting *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024)).

In the securities law context, "the documents need not be attached to the Complaint to be considered so long as they are central to the claim and either undisputed or not considered for the truth of the documents." *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 11-22855-CIV, 2013 WL 3295951, at *10 (S.D. Fla. Apr. 19, 2013) (citing *Hubbard v. BankAtlantic Bancorp, Inc.,* 625

F.Supp.2d 1267, 1280 (S.D. Fla. 2008)). Courts are "permitted to review the Defendants' SEC filings [] in evaluating the sufficiency of the Plaintiffs' allegations." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1297 n. 15 (11th Cir. 2011) (citing *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC,* 600 F.3d 1334, 1337 (11th Cir. 2010); *see also Harris v. Ivax Corp.,* 182 F.3d 799, 802 n.2 (11th Cir. 1999) (in securities fraud cases, "[t]he usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in its context").

Defendants' Exhibits 1–6 and 8 attached to the Motion to Dismiss have been referenced in the Amended Complaint, and in many cases, form the basis of Plaintiffs' misrepresentations claims. Accordingly, the Court will consider these documents at this juncture as they contain the context in which the alleged misrepresentations were made and are therefore central to Plaintiffs' claims. Plaintiffs do not dispute the authenticity of the documents. With respect to Defendants' Exhibit 7, Spirit's Form 8-K filed with the SEC on August 21, 2025, which is not directly referenced in the Amended Complaint, the Court likewise agrees with Defendants that it is properly considered at this juncture because it relates to the "events that are central" to Plaintiffs' ability to plead elements of their Section 10(b) claims, including Spirit's disclosures and Defendants' alleged knowledge of the purported fraud. *See Johnson*, 107 F.4th at 1300. Moreover, the authenticity of the document is not disputed.

However, judicial notice of any particular fact in these documents is unwarranted. Taking judicial notice of facts is "a highly limited process." *Shahar v. Bowers,* 120 F.3d 211, 214 (11th Cir. 1997). "The reason for this caution is that the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Id.*; *see also* Fed. R. Evid. 201(e). "Care should be taken by the court to identify the fact it is noticing, and its justification for doing so. This is particularly necessary when a document . . . from which any number of distinct facts might be drawn, is the object of the notice." *Lozman v. City of*

4

*Riviera Beach*, 2022 WL 19919679, at \*6 (S.D. Fla. Sept. 29, 2022) (quoting *Colonial Leasing Co. of N. Eng., Inc. v. Logistics Control Grp. Int'l*, 762 F.2d 454, 459 (5th Cir. 1985)). Defendants do not identify which facts (within the lengthy documents) for which they seek the Court to take judicial notice. Accordingly judicial notice is inappropriate and unnecessary.

## II.     BACKGROUND

Proceeding now to the merits of Defendants' Motion to Dismiss [DE 53].

Spirit Aviation Holdings, Inc. ("Spirit") is the parent company of Spirit Airlines, LLC ("Spirit Airlines"), an ultra low-cost carrier airline that provided passenger air transportation services for destinations throughout the U.S., Latin America, and the Caribbean with a focus on leisure travel. AC ¶ 3. On May 2, 2026, Spirit Airlines permanently closed its doors and ceased all operations.[1]

In the two years prior to closing its doors, Spirit and its predecessor declared bankruptcy twice. In November 2024, Spirit's predecessor entity, Spirit Airlines, Inc., and its affiliated debtors filed a voluntary petition for Chapter 11 bankruptcy protection after years of mounting losses and increased competition, among other issues. *See In re Spirit Airlines, LLC, et al.*, Case No. 24-11988-shl (Bankr. S.D.N.Y. 2024) ("First Bankruptcy"). In August of 2025, just five months after Spirit emerged from the First Bankruptcy, Spirit filed a second bankruptcy petition. *See In re: Spirit Aviation Holdings, Inc., et al.*, 25 11897-shl (Bankr. S.D.N.Y. 2025) ("Second Bankruptcy"), AC ¶¶ 3, 4.

---

[1] Though not in the record, the Court takes judicial notice of this widely publicized fact, which came to pass two months after Plaintiffs filed the March 2, 2026 Amended Complaint. *See e.g.*, Aamer Madhani, Rio Yamat, Jeff Amy and Mike Catalini, *Spirit Airlines Says it is Going out of Business After 34 Years*, Associated Press (May 2, 2026, 3:42 PM), https://apnews.com/article/spirit-airlines-trump-bailout-bankruptcy-37a4818e1b71c0905d022f669d85948c.

Spirit emerged from the First Bankruptcy, and the Plan of Reorganization became effective, on March 12, 2025—the start of the Class Period. AC ¶ 5. Following the emergence from the First Bankruptcy and throughout the Class Period (through August 29, 2025), maintaining adequate liquidity was essential to Spirit's survival. Spirit had an $850 million liquidity requirement under its agreement with its credit card processing company, Elavon, which if not maintained, would trigger holdbacks and reduce unrestricted cash by hundreds of millions of dollars. In addition, Spirit's $275 million Exit Revolving Credit Facility contained a $500 million liquidity requirement, and its $840 million in secured notes had a $450 million liquidity requirement. AC ¶ 8. According to the Amended Complaint, Defendants knew, upon emerging from the First Bankruptcy, they had little chance of maintaining these liquidity thresholds. Spirit's operating income was approximately negative $100 million per month, virtually ensuring default and acceleration of its debt obligations. According to the allegations, Defendants did not disclose these known, imminent triggers until just days before the end of the Class Period. AC ¶ 9.

Spirit's liquidity depended in part upon on an Aircraft Sale Agreement, in which Spirit planned to sell twenty-three of its A320/A321 Airbus jets to GA Telesis ("GAT") for $519 million. The Aircraft Sale Agreement conditioned the sale on passing inspection and technical acceptance. Defendants knew of the acute risk of failing inspection and knew that they would be unable to timely book repair slots to bring the aircrafts to saleable condition. Spirit allegedly failed to disclose these risks to investors. AC ¶¶ 10-14. The public filing of the Aircraft Sale Agreement as an Exhibit to Spirit's FY 2024 Form 10-K redacted key parts of these provisions to conceal from investors the risk that the 23 planes were not in a condition to pass inspection or gain technical acceptance. AC ¶ 10.

Plaintiffs allege that, during the Class Period (March 12, 2025 through August 29, 2025), Defendants made a series of misleading statements in Spirit's (1) press releases, (2) Q1 2025 Form 10-Q, and (3) Q2 2025 Form 10-Q, [2] that either downplayed the looming liquidity crisis, omitted Spirit's below-threshold liquidity levels, or hid the fact that the Aircraft Sale Agreement had failed or would imminently fail. Each statement is examined below. *See infra* Section IV.

The end of the story is that on August 11, 2025, Defendants stated in Spirit's Q2 2025 Form 10-Q that "there is substantial doubt as to the Company's ability to continue as a going concern within 12 months." AC ¶ 81. On this news, Spirit's stock price fell 40.68%, to close at $2.10 per share on August 12, 2025. AC ¶ 82. Four days later, Spirit agreed to pay Elavon, its credit card processing company, $50 million. AC ¶ 59. Then, a $3 million per day holdback was imposed to address Spirit's ongoing breach of the liquidity covenant. *Id.* On August 22, 2025, news reports emerged that Spirit had retained counsel in preparation for a second bankruptcy. AC ¶ 88. On this news, the stock price dropped over 14% the next trading day, closing at $1.41 per share on August 25, 2025. *Id.* On August 29, 2025, Spirit announced that it had already filed the Second Bankruptcy. AC ¶ 89. The NYSE suspended trading of Spirit stock. AC ¶ 91. On September 3, 2025, when Spirit reopened trading on the over-the-counter market, Spirit's stock price fell 58.20%, to close at $0.51 per share. AC ¶ 92. Finally, on May 2, 2026, Spirit Airlines permanently closed its doors and ceased all operations. The Independent Examiner appointed by the Second Bankruptcy Court concluded that Spirit's "operational and financial deterioration" that preceded the second bankruptcy "unfolded at a speed and scale that was not reasonably foreseeable" as of the confirmation of the first bankruptcy. [DE 53-8] p. 6.

---

[2] "Publicly traded corporations must file the Form 10–Q quarterly as required by the Securities Exchange Act of 1934, 15 U.S.C. § 78m, 17 C.F.R. § 240.13a–13. In the form, the corporation must make certain financial statements and disclosures regarding its activities." *S.E.C. v. Smyth*, 420 F.3d 1225, 1227 (11th Cir. 2005).

III.     **STANDARD OF LAW**

To adequately plead a claim for relief, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," to "give fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley*, 355 U.S. at 41). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover. *See Linder v. Portocarrero*, 963 F. 2d 332, 334–36 (11th Cir. 1992) (citing *Robertson v. Johnston*, 376 F. 2d 43 (5th Cir. 1967)).

Nevertheless, the Court need not take allegations as true if they are merely "threadbare recitals of a cause of *action's* elements, supported by mere conclusory statements . . ." *Iqbal*, 556 U.S. at 663. In sum, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Twombly*, 550 U.S. at n. 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183 (1984)).

IV.     **DISCUSSION** [3]

By its instant Motion, Spirit moves to dismiss the claims against it with respect to

---

[3] This discussion section contains reproductions of Spirit's challenged statements as formatted in the Amended Complaint. This Order assumes that Plaintiffs specifically challenge bolded and italicized portions of Spirit's statements. This Order keeps Plaintiffs' formatting, and also adds back omitted portions of Spirit's financial statements that are contained within the disputed paragraphs, but excluded from the Amended Complaint. Those re-added portions are underlined.

Plaintiffs' challenges of eleven statements made by Spirit or Defendants during the Class Period: two statements (one each) in press releases issued on March 12 and May 27, 2025, AC ¶¶ 63, 67; four statements in Spirit's Q1 2025 10-Q (filed May 31, 2025), ¶¶ 70, 72, 74, 76; one statement in Spirit's Q2 2025 10-Q (filed August 11, 2025), ¶ 83; and Davis's and Cromer's signed certifications that each of the 10-Q reports was accurate (two certifications for each 10-Q; four certifications total). ¶¶ 78, 85.

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ, in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). In turn, Rule 10b–5 makes it unlawful for "any person," in connection with the purchase or sale of a security, "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). The Supreme Court has implied a private right of action for investors under Rule 10b–5. *Carvelli v. Ocwen Fin. Corp.,* 934 F.3d 1307, 1316–17 (11th Cir. 2019) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318–19 (2007)).

A claim under the Exchange Act must allege "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on a misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called loss causation." *City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, No. 15-CV-61170, 2016 WL 4705718, at *11 (S.D. Fla. June 21, 2016); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008).

A particular statement is misleading under Section 10(b) and Rule 10b–5 if "in the light of the facts existing at the time of the [statement] ... [a] reasonable investor, in the exercise of due care, would have been misled by it." *IBEW Local 595 Pension and Money Purchase Pension Plans v. ADT Corp.*, 660 Fed.Appx. 850, 857 (11th Cir. 2016) (quoting *FindWhat Investor Grp.*, 658 F.3d at 1305). Thus, the "appropriate primary inquiry" is "into the meaning of the statement to the reasonable investor and its relationship to truth." *FindWhat Investor Grp.*, 658 F.3d at 1305 (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 862 (2d Cir. 1968)). To be actionable under the securities laws, the misrepresentations and omissions must also be "material." 17 C.F.R. § 240.10(b); *see also Mizzaro*, 544 F.3d at 1236. Materiality depends on whether a "substantial likelihood" exists that a "reasonable investor" would have viewed a misrepresentation or omission as "significantly alter[ing] the 'total mix' of information made available." *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 455 (1976)).

In addition to the plausibility standard on a 12(b)(6) Motion, Plaintiffs' complaint must survive a Rule 9(b) standard. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001), Rule 9(b) requires that, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) dictates that the complaint must allege:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Investor Grp.*, 658 F.3d at 1296.

10

Finally, the Private Securities Litigation Reform Act ("PSLRA") imposes an additional heightened pleading requirements for Section 10(b) and Rule 10b–5 claims predicated on allegedly false or misleading statements or omissions. The PSLRA provides, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Specifically, the complaint must "plead with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the alleged materially false or incomplete statements." *Mizzaro*, 544 F.3d at 1238 (quotation marks omitted).

## A.  Nonactionable Corporate Puffery or Opinion AC ¶¶ 63, 67.

Plaintiffs challenge the following statements, made on March 12, 2025, and May 27, 2025, by Christie and Davis, respectively. [DE 43] ¶ 63, 67. Defendants argue these statements are nonactionable puffery. The Court agrees with Spirit that these statements are non-actionable.

> ***We're pleased to complete our streamlined restructuring and emerge in a stronger financial position to continue our transformation and investments in the Guest experienc*e** … Throughout this process, we've continued to make meaningful progress enhancing our product offerings, while also focusing on returning to profitability and positioning our airline for long-term success. Today, we're moving forward with our strategy to redefine low-fare travel with our new, high-value travel options. AC ¶ 63.

> ***I'm pleased with our progress in driving change to our fleet, our product and our market positioning.*** The Spirit team has faced down tough challenges before, and I'm gratified to see such a strong focus and commitment. AC ¶ 67.

A statement is nonactionable, immaterial puffery where it is "[e]xcessively vague, generalized, and optimistic" *Carvelli.,* 934 F.3d at 1320. These statements in the March 12 and May 27, 2025 press releases—that Spirit was in a "stronger financial position" after the first bankruptcy, that Mr. Davis was "pleased" with Spirit's "progress" are precisely the types of

11

statements the Eleventh Circuit has held to be nonactionable. *See Carvelli*, 934 F.3d at 1321 (statements that the company had devoted "substantial resources" to its problems, with "improved results," that it had taken a "leading role" and was making "progress" toward compliance" were puffery and immaterial as a matter of law); *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1027–28 (11th Cir. 2003) (holding that the statement, "as our Company's strong performance continues," to be non-actionable puffery, which, as a matter of law, would not induce reliance); *see also In re Royal Caribbean Cruises Ltd. Sec. Litig.,* 2013 WL 3295951, at *12  (statements that company had "healthy demands, "intention to compete successfully," and the "encouraging" prospect of early bookings" nonactionable puffery).

### B.  Q 1 2025 10Q Forward-looking Safe Harbor AC ¶ 70

Plaintiffs challenge the below statements contained within the Q1 2025 10Q, filed May 30, 2025, for the quarter ending March 31, 2025. AC ¶¶ 70, 74. According to Spirit, these are nonactionable statement of opinion and are true or nonactionable in light of the robust risk disclosures also contained within the Q1 2025 10Q.

> Management has assessed the impact of the current pricing environment on its liquidity requirements over the next 12 months. Based on such evaluation, ***we have concluded that it is probable we will have sufficient liquidity to meet our future cash needs with cash and cash equivalents, cash flows from operations, and management's current plans***, including the implementation of network and product enhancements, including to our Go Comfy travel option, the execution of planned sale leaseback transactions related to certain of our owned spare engines, and the renegotiation of terms with our credit card processor and/or other parties to facilitate payment processing. <u>The Company can give no assurances that its current plans will be successful or that it will be able to secure additional sources of funds to support its operations, or, if such funds are available to the Company, that such additional funds will be on the terms that are acceptable to the Company or sufficient to meet its liquidity needs.</u>AC ¶ 70
> . . .
> ***Our condensed consolidated financial statements have been prepared assuming that we will continue to operate as a going concern, which contemplates the continuity of operations, realization of assets and liquidation of liabilities in the***

*normal course of business,* and does not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classifications of liabilities that may result from uncertainty related to our ability to continue as a going concern. AC ¶ 70

The Court agrees with Spirit that these statements are not actionable in light of the accompanied risk disclosure statements. The PSLRA "provides a safe harbor from liability for certain 'forward-looking statements.'" *Harris*, 182 F.3d at 803 (citing 15 U.S.C. § 78u–5(c)(1)). Under this safe harbor provision, "corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Id.* (quoting 15 U.S.C. § 78u5(c)(1)(A)(i)). Where meaningful cautionary language accompanies a statement, the court need proceed no further because the defendant's state of mind is irrelevant. *Id.* at 804–05. Even absent cautionary language, forward looking statements are protected unless plaintiff shows the statement was made with "actual knowledge ... the statement was false or misleading." *Id.*; 15 U.S.C. § 78u–5(c)(1)(B)(i)–(ii). The PSLRA defines forward-looking statement as follows:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(h)(i)(1)

The bolded sentences in the statements in AC ¶ 70 above are forward looking statements of projection within the meaning of the PSLRA. The statement that **"it is probable we will have sufficient liquidity to meet our future cash needs. . . "** AC ¶ 70 contains projections on the company's financials as covered by the PSLRA *See* 15 U.S.C. § 78u-5(h)(i)(1)(A). This statement is accompanied by, in the same paragraph, cautionary language that states, "[t]he Company *can give no assurances* that its current plans will be successful or that it will be able to secure additional sources of funds to support its operations, or, if such funds are available to the Company, that such additional funds will be on the terms that are acceptable to the Company or sufficient to meet its liquidity needs." Q1 2025 10Q, [DE 53-5] p. 7. *See e.g.*, *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1278 (S.D. Fla. 2017) (statement that "there can be no assurance such measures will prevent our ESG business from suffering continued operating losses." was sufficiently cautionary within the safe harbor provision).

Likewise, the statements, **"[o]ur condensed consolidated financial statements have been prepared assuming that we will continue to operate as a going concern . . ."** AC ¶ 70 is plainly a statement of assumption underlying future projections as covered by the PSLRA. *See* 15 U.S.C. § 78u-5 (h)(i)(1)(D). The statement is directly accompanied in the same paragraph by the statement that it "does not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classifications of liabilities that may result from uncertainty related to its ability to continue as a going concern." Q1 2025 10Q, [DE 53-5] p. 7.

In both instances, the cautionary language is not boilerplate but is "explicit" and "linked to the projections about which the plaintiff complains," as well as "specifically tailored" to defendant's business. *In re Royal Caribbean*, 2013 WL 3295951, at *15. Further, these warnings

14

were "of a significance similar to that actually realized," *Harris*, 182 F.3d at 807. Accordingly, these statements are non-actionable.

Additionally, and in the alternative, the Court agrees with Spirit that the statement "**we have concluded that it is probable we will have sufficient liquidity to meet our future cash needs with cash and cash equivalents, cash flows from operations, and management's current plan. . .**" ¶ 70 is a nonactionable statement of opinion. "[O]pinion are generally nonactionable because liability attaches only in the case of an 'untrue statement of a material *fact*.'" *Carvelli*, 934 F.3d at 1322 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 183 (2015). As the Eleventh Circuit and the Supreme Court have explained,

> [E]very statement of opinion explicitly affirms one fact: that the speaker actually holds the stated belief. Thus, a statement of opinion that falsely describes the speaker's own state of mind is an untrue statement of fact—as to what the speaker actually believes—and accordingly will subject the issuer to liability (assuming the misrepresentation were material).

*Carvelli,* 934 F.3d at 1322 (quoting *Omnicare,* 575 U.S. at 183) (internal quotation marks and citations omitted). Here, the statement makes no affirmative representation, but merely opines on the probability of an outcome. The AC contains no allegations about Mr. Christie's or Mr. Davis' state of mind, nor does it allege that Davis or Cromer subjectively believed that it was *improbable* that Spirit we will have sufficient liquidity to meet its needs, given the "implementation of network and product enhancements, including to our Go Comfy travel option, the execution of planned sale leaseback transactions related to certain of our owned spare engines, and the renegotiation of terms with our credit card processor and/or other parties to facilitate payment processing" AC ¶ 70. Although Plaintiffs allege other facts to suggest that maintaining the requisite level of liquidity would be challenging, this statement itself does not communicate a fact that would be materially misleading to a reasonable investor. Accordingly it is likewise non-actionable.

15

### C.  Q 1 2025 10Q Aircraft Sale Agreement AC ¶ 74

Plaintiffs likewise challenge the below statement contained within the Q1 2025 10Q:

**Loss(Gain) on Disposal**

During the Current Predecessor Period, the Company recorded a loss of $11.7 million within loss (gain) on disposal of assets in the condensed consolidated statements of operations. AC ¶ 74.

….

***Loss (gain) on disposal of assets for the Current Predecessor Period included an $18.5 million adjustment to impairment charges recorded during the fourth quarter 2024 related to change in estimates of costs to sell. These charges are associated with the Company's plan to early retire and sell 23 A320ceo and A321ceo aircraft, in accordance with the aircraft sale and purchase agreement with GAT entered into on October 29, 2024.*** AC ¶ 74.[4]

Plaintiffs argue this statement was materially misleading when made because it omitted to disclose, *inter alia*, that Spirit had already failed to timely deliver 21 of the 23 aircrafts, and it was unlikely the remaining aircrafts could be sold in the near future because they required heavy maintenance, which was unlikely to be accomplished due to backlogs with the engine servicing agent. AC ¶ 75. In turn, Spirit argues that it had no duty to disclose this information because these challenged statements say nothing about the ASA and convey no message about the status of the plane sales it governed; thus, this loss(gain) statement was not misleading.

The Court agrees with Spirit that this statement did not open the doors to a substantive discussion on the aircraft sale, and accordingly, Spirit had no obligation to provide such a discussion as a matter of law. The securities laws do not create any "affirmative duty to disclose any and all material information." *In re Galectin Therapeutics, Inc. Sec. Litig.,* 843 F.3d 1257,

---

[4] Additionally, and in the alternative, this statement appears to fall within the PSLRA safe harbor provision as a "statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)." 15 U.S.C. § 78u-5(h)(i)(1)(D).

1274 (11th Cir. 2016). Only where a corporation "voluntarily reveal[s] one fact about its operations" does a "duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" *FindWhat Investor Grp.*, 658 F.3d at 1305 (quoting *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (en banc)); *see also Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 38 (2011) (the materiality requirement is satisfied when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (quotation omitted). This challenged statement in AC ¶ 74 merely adjusted Spirit estimated loss (gain) on disposal of the aircraft due to increased costs under the ASA, without any further discussion that could have falsely conveyed anything about whether the sales were on schedule, let alone about the status of aircraft inspections. Plaintiffs do not allege that the recording of the adjustment was inaccurate in any way, and they do not otherwise explain how or why a reasonable investor would have been misled by that update. Accordingly, where the statement itself is not alleged to be inaccurate, it is not made misleading by the absence of additional discussion on the Aircraft Sale Agreement. Moreover, this statement is the closest that the Q1 2025 10Q comes to discussing the Aircraft Sale Agreement, and no other statements in the Q1 2025 10Q (such as the "going concern" statement in AC ¶ 76) would open the door to this discussion, either.

### D.  Q1 2025 10Q Liquidity Statements AC ¶¶ 72, 76

Plaintiff challenges the following statement in the May 30, 2025 Q1 2025 10-Q for the period ending March 31, 2025, as materially misleading when made:

> the Company's credit card processors do not require the Company to maintain cash collateral, provided that the Company satisfies certain liquidity and other financial covenants Failure to meet these covenants would provide the processors the right to put in place a holdback resulting in a commensurate reduction of unrestricted

> <u>cash. As of March 31, 2025 and December 31, 2024, the Company's credit card
> processors were holding back no remittances.</u> AC ¶ 72. [DE 53-5] p. 27.
> . . .
> As of March 31, 2025 and 2024, the Company was in compliance with the liquidity
> and other financial covenants in its credit card processing agreement." AC ¶ 72;
> [DE 53-5] p. 28.

Plaintiffs argue these statements materially misleading when made because they omitted to disclose that Spirit had already breached the liquidity covenant as of the May 30, 2025 filing date of the Q1 2025 Form 10-Q, or was perilously close to doing so. AC ¶ 73. Furthermore, Plaintiffs challenge the following statements because they are framed as hypotheticals, when in fact the breach of the liquidity agreement had already occurred:

> ***We are highly dependent upon our cash balances and operating cash flows.***
>
> As of March 31, 2025, we had cash and cash equivalents of $487.5 million and $275.0 million available for borrowing under our Exit Revolving Credit Facility. We will continue to be dependent on our operating cash flows to fund our operations and to make scheduled payments on our aircraft-related fixed obligations and other debt obligations. However, we anticipate that we will need additional funds to finance our operations and our debt obligations. AC ¶ 76.
>
> ***We have implemented and continue to implement plans to improve our liquidity,*** including the implementation of network and product enhancements, including to our Go Comfy travel option, the execution of planned sale leaseback transactions related to certain of our owned spare engines, and the renegotiation of terms with our credit card processor and/or other parties to facilitate payment processing, and enhancements to our Go Comfy travel option. However, there can be no assurance that we will be able to achieve our business plans or return to profitability. Further, we can give no assurances that we will be able to secure additional sources of funds to support our operations or refinance our existing indebtedness, or, even if such additional funds are available to us, that such additional financing will be on terms that are acceptable to us or sufficient to meet our needs. ***If we are unable to raise sufficient capital or refinance our existing indebtedness when needed, our business, financial condition and results of operations will be materially and adversely affected, and we may need to significantly modify our operational plans to continue as a going concern. In addition, our credit card processors are entitled to withhold receipts from customer purchases from us, under certain circumstances. If we fail to maintain certain liquidity and other financial covenants, their rights to holdback would become operative, which would result in a reduction of unrestricted cash that could be material. Inadequate liquidity may materially adversely affect our share price and our ability to raise new***

*capital or to enter into or amend critical contractual relations with third parties due to concerns about our ability to meet our contractual obligations.* AC ¶ 76.

The Court disagrees that the above statements, AC ¶¶ 72, 76, are actionably misleading. These statements were made for the period ending March 31, 2025: the conclusion of the relevant reporting period covered by the Q1 2025 10Q. As of March 31, 2025, the end of the reporting period, the total liquidity was *above* the $850 million threshold; Spirit had $882 million in available liquidity. *See* AC ¶ 53; [DE 53-8] pp. 28, 37 (discussing drop in liquidity during Q2). Thus, the statement that "*[a]s of March 31, 2025* and 2024, the Company was in compliance with the liquidity and other financial covenants in its credit card processing agreement," and the accompanying hypothetical statements based upon this representation, are true. AC ¶¶ 72, 76 (emphasis added).

Although liquidity began to fall below the $850 million threshold following the end of the reporting period on March 31, 2025—dropping to $759 million by May 2025 when the Q1 2025 10Q was issued—Spirit was not required to report (and did not report) on the March through May period in the Q1 2025 10Q. *See e.g.*, *S.E.C. v. Dauplaise*, No. 6:05CV1391 ORL 31KRS, 2006 WL 449175, at *6 n. 16 (M.D. Fla. Feb. 22, 2006) (company's Second Quarter 10-Q was not made misleading by the failure to disclose facts that occurred "after the time period covered by that 10-Q."). Plaintiffs' conclusory assertion that "Defendants were required to disclose liquidity concerns for the period starting "from the date the financial statements are issued" AC ¶¶ 51-52 is not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 663.

Alternatively, Plaintiffs argue that the statement in AC ¶ 72 was misleading because Spirit was "burning cash at a rate that made a breach of that covenant virtually certain by the end of Q2 2025, which was only a month away." AC ¶ 73. But the true statements in the Q1 2025 10Q cannot be made untrue by the subsequent events, that liquidity dropped *following* the conclusion of the

applicable reporting period on March 31, 2025. This type of "fraud-by-hindsight" pleading—

"where a plaintiff alleges that the fact that something turned out badly must mean defendant knew

earlier that it would turn out badly"—defeats the inference of scienter. *See City of Hollywood*

*Police Officers' Ret. Sys. v. Citrix Sys., Inc.,* 649 F. Supp. 3d 1256, 1273 (S.D. Fla. 2023)

(quotations omitted); *In re Greenlane Holdings, Inc. Sec. Litig.* 1511 F. Supp. 3d 1283, 1311-12

(S.D. Fla. 2021).

### E.  Q2 2025 10Q ¶ 83

Plaintiffs challenge the August 11, 2025 statement in the Q2 2025 Form 10-Q for the period

ending June 30, 2025 statement that:

> "[a]s of June 30, 2025 and 2024, the Company was in compliance with the liquidity
> and other financial covenants in this credit card processing agreement." ¶ 83.[5]

Plaintiffs allege this statement "appears to be outright false" or, in the alternative, was

misleading as it omitted that Spirt had already breached the Elavon covenant by the time of filing

or was then on the path to breach within the next two weeks." AC ¶ 83.

With respect to this statement, Plaintiffs have sufficiently alleged statement—standing

alone—was misleading. Spirit's agreement with its credit card processing company required Spirit

to maintain a liquidity level of $850 million. But the examiner's report found liquidity had dropped

to $683 million by the end of June of 2025. AC ¶¶ 53-54. Thus, the statement that "as of June 30,

2025 and 2024, the Company was in compliance" with its agreement with Elavon is at the very

least highly misleading, as Spirit was in fact in breach of its agreement for the period of the

reporting. Spirit's defense (argued in a footnote) is that as of June 30, 2025, Elavon had *not yet*

*called default* on its agreement, thus hinging Spirit's representation of "compliance" on whether

---

[5] The record does not appear to contain complete Q2 2025 10Q that includes this statement; however, neither party challenges the fact that the Q2 2025 10Q contained this statement, and the Court has independently verified that this statement is contained within the publicly filed Q2 2025 10Q.

Elavon had decided to *exercise its rights* under the agreement. [DE 53] p. 12. Spirit contends that Elavon called default on August 11, 2025, which was three months after the applicable reporting period ending June 30, 2025 (and the same date of the publication of the Q2 2025 10Q). But it is plausible that reasonable investor would likely understand "compliance" with an agreement to suggest compliance with the *terms* of that agreement—and would not understand compliance from Elavon's perspective. *See S.E.C. v. Morgan Keegan & Co.,* 678 F.3d 1233, 1245 (11th Cir. 2012) ("materiality is an 'objective' inquiry involving the significance of an omitted or misrepresented fact to a reasonable investor") (quoting *TSC Industries, Inc.,* 426 U.S. at 445). Moreover, the concepts of compliance and breach

Still, the statement is nonactionable, as it was immaterial and did not induce reliance. *Basic Inc. v. Levinson*, 485 U.S. 224, 238, (1988) ("It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant."); *Carvelli*, 934 F.3d at 1317 ("The materiality requirement aims to . . . ensure that not every minor misstatement provides litigation fodder for disgruntled investors."). Here, investors did not view the above "compliance" statement in AC ¶ 83,  as altering the total mix of information available. This is because alongside the Q2 2025 10Q, admitted: "there is substantial doubt as to the Company's ability to continue as a going concern within 12 months." AC ¶ 81. The very next day, Spirit's stock price fell 40.68%, to close at $2.10 per share. AC ¶ 82.  Thus, even to the extent that the Q2 2025 10Q made one minor misstatement, it was *evidently* not materially misleading to investors, such that investors mistakenly relied on it. Instead, investors correctly understood—based upon all of the information revealed in the Q2 2025 10Q—that Spirit was on the decline and responded accordingly. Likewise, reliance on this statement (the fourth element of an Exchange Act claim) would have been unreasonable as matter of law, given the immediate and dramatic market response to the overall

21

bleak information disclosed in the Q2 2025 10Q. *See In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA" Litig.*, 247 F.R.D. 32, 38 (D.D.C. 2008) ("[W]hen sufficient corrective information enter[s] the market," it makes "reliance thereafter unreasonable as a matter of law, and thereby rebut[s] the fraud-on-the-market presumption."); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 367 (4th Cir. 2004) ("[t]he central premise of the fraud on the market theory is that prices of actively traded securities reflect publicly available information."). Spirit sufficiently disclosed the severity of the risks to the company to enable a reasonable investor to make an informed choice about whether to hold or sell their positions.

## F. Certifications

To the extent that Sarbanes-Oxley Act certifications can be "an actionable basis for a securities fraud claim," *MAZ Partners LP v. First Choice Healthcare Sols., Inc*., 2020 WL 1072582, at *5 (M.D. Fla. Feb. 14, 2020), they are not actionable here, where no material misstatements have been adequately alleged, the certification statements likewise fail. AC ¶ 85.

## G. Scienter

If these reasons were not sufficient for dismissal, Plaintiffs have failed to state that Defendants acted with the requisite scienter. Section 10(b) and Rule 10b–5 requires a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Mizzaro*, 544 F.3d at 1238. "Severe recklessness" is a term reserved for those highly unreasonable omissions or misrepresentations that involve "extreme departure" from the standards of ordinary care and that present a danger of misleading buyers or sellers which is either known to the defendant or is "so obvious" that the defendant must have been aware of it. *Id*.  Pursuant to the PSLRA, "the complaint shall, *with respect to each act or omission alleged to violate this chapter*, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u–4(b)(2) (emphasis added).  A "strong inference" of scienter means an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. In making the scienter inquiry, "courts must consider the complaint in its entirety," counting any omissions and ambiguities in the complaint against an inference of scienter. *Id.* at 322, 326.  The inquiry is "inherently comparative" because courts "must take into account plausible opposing inferences." *Tellabs, Inc.*, 551 U.S. at 323.

Plaintiffs allege Davis "spoke with authority regarding the Company's bankruptcy risks" AC ¶ 95. They allege Cromer "has repeatedly declared his knowledge of the day-to-day operations of the Company; he highlighted the Aircraft Sale's importance in the First Bankruptcy; he represented in the First Bankruptcy that he and Christie had actual knowledge of the company's affairs; he signed the statement of financial affairs on January 2, 2025 in the First Bankruptcy, which included hundreds of pages of the Company's assets and liabilities. AC ¶ 96, 100. Finally, they allege Christie allegedly "spoke authoritatively" on the company's liquidity following emergence from the first bankruptcy. AC ¶ 98. "That the Company's liquidity concerns were the most important issues at the Company coming out of the First Bankruptcy" Plaintiffs, allege, "suggests Cromer, Davis, and Christie were paying attention to them." AC ¶ 102.

In addition, Plaintiffs allege that (i) the temporal proximity between the misstatements and the bankruptcy disclosure, (ii) the fact that Defendants hid terms of the Aircraft Sale Agreement by redacting them in their annual report, and (iii) that Defendants secretly retained bankruptcy counsel and advisers beginning nearly three months before filing for the Second Bankruptcy, and before the Defendants made false statements about the Company's liquidity, each further bolsters the inference of scienter. AC ¶¶ 80-89, 103-04.

These allegations do not suffice to show a "strong inference" that Defendants were severely reckless or had an "intent to deceive, manipulate, or defraud," *Mizzaro*, 544 F.3d at 1238. Plaintiffs "allege no particularized facts that directly show [Cromer, Christie, and Davis] intended to deceive shareholders or knew about or was severely reckless with respect to deficiencies in reporting." *Brophy v. Jiangbo Pharms., Inc.,* 781 F.3d 1296, 1303 (11th Cir. 2015). Instead, Plaintiffs generally allege that Defendants should have been aware of the misrepresentations given their titles at the company, their awareness of the company's financials, their knowledge of the liquidity problem, the impending bankruptcy, their failed attempts at fixing the problem, and their failure to disclose these risks. These generalized allegations Defendnats' awareness of Spirit's financials, without specifics, do not clearly demonstrate an intent to defraud. *See id*; *In re Smith Gardner Sec. Litig.,* 214 F.Supp. 2d 1291 1303 (S.D. Fla. 2002) ("[m]ere allegations that Defendants held senior management positions, had access to inside information, and therefore must have known of the falsity of certain statements is insufficient to plead scienter"); *In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1324 (M.D. Fla. 2002) (holding that allegations that defendants "must have known" that receivables would turn out to be uncollectible because of high positions in the company did "not pass muster under the PSLRA.").

Moreover, to the extent that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference," *Tellabs, Inc.*, 551 U.S. at 310, it is not apparent that the statements were designed to induce reliance such that any financial gain would result, in light of the simultaneous and robust disclosures indicating possible risks or active decline. *Kosowsky v. Icahn Enters. L.P.*, 748 F. Supp. 3d 1303, 1322 (S.D. Fla. 2024) (finding that the "public disclosures regarding his margin loans significantly cut against the inference of fraudulent intent.").

24

Finally, "Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006). Here, Plaintiffs have not alleged any "glaring … irregularities" or "red flags" in the financial statements that would invite this inference of scienter. *Id.*

## V. Section 20(A)

Under Section 20(a) of the Exchange Act, to state a claim for controlling person liability against a defendant, it must be alleged that the defendant had:  (1) the power to control the general affairs of the entity primarily liable for the Section 10(b) or Rule 10b–5 violation at the time of the violation, and (2) the power to control or influence the specific policy that resulted in the primary violation under Section 10(b) or Rule 10b–5. *In re Unicapital Corp. Sec. Litig.*, 149 F.Supp.2d 1353, 1367 (S.D. Fla. 2001) (citing *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396 (11th Cir. 1996)). "Section 20(a) is not a freestanding claim but is merely a means of imposing liability, not only on the person who actually commits a securities law violation, but also on an entity or individual that controls the violator." *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1288 (S.D. Fla. 2011) (quoting *Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir.2001), *abrogated on other grounds by Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010)). Here, where the Court determines Plaintiffs have failed to allege primary liability, the Section 20(a) claim likewise fails. *See Rosenberg v. Gould*, 554 F.3d 962, 966 (11th Cir. 2009).

**VI.     CONCLUSION**

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

a.   The Motion [DE 53] is **GRANTED**;

b.   The Amended Complaint is **DISMISSED WITHOUT PREJUDICE**;

c.   Pursuant to their request, Plaintiffs are afforded one opportunity to file second amended complaint curing deficiencies identified herein by August 27, 2026.

d.   Failure to file a second amended complaint will result in the Court dismissing this action and closing this case.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 13th day of August, 2026.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies to

Counsel of Record